# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

**ANTHONY BOYD,**
  **Plaintiff,**

**v.**

**JOHN Q. HAMM, Commissioner,**
**Alabama Department of Corrections, in his**
**official capacity,**

**TERRY RAYBON, Warden,**
**Holman Correctional Facility, in his official**
**capacity,**

**ALABAMA DEPARTMENT OF**
**CORRECTIONS, an**
**Administrative Department of the State of**
**Alabama, and**

**STEVEN MARSHALL, Attorney General,**
**State of Alabama, in his official capacity,**

  **Defendants.**

**Case No. _____**

**CAPITAL CASE**

---

## COMPLAINT

---

4906-1223-1254.v2

## INTRODUCTION

1.    Anthony Boyd ("Mr. Boyd" or "Plaintiff") is in the custody of Defendant Alabama Department of Corrections ("ADOC"), Defendant Hamm, and Defendant Raybon, at William C. Holman Correctional Facility ("Holman") under a sentence of death imposed by the State of Alabama.[1]

2.    Mr. Boyd brings this action, pursuant to 42 U.S.C. § 1983 alleging Defendants have deprived, or will deprive, him of rights and privileges secured by the Constitution and laws of the United States.

## PARTIES

3.    Anthony Boyd, a citizen of the United States and resident of Alabama, is subject to execution by the State of Alabama's nitrogen execution protocol ("Protocol") pursuant to a state court judgment of conviction for capital murder.

4.    John Q. Hamm, in his official capacity, is the Commissioner of the ADOC. Defendant Hamm approved the Protocol.

5.    Terry Raybon, in his official capacity, is the Warden of Holman and Mr. Boyd's statutory executioner. Defendant Raybon implements the Protocol and oversees the execution team.

---

[1] On June 11, 2025, Defendant Marshall moved the Alabama Supreme Court to set an execution date for Mr. Boyd. The Alabama Supreme Court extended the time for Mr. Boyd to file his response to Defendant's motion to July 18, 2025.

6.     ADOC is the administrative department of the State of Alabama responsible for administering and exercising direct and effective control over penal and corrections institutions throughout the state of Alabama, including performing executions. ADOC is an agency of the State of Alabama.

7.     Steven Marshall, in his official capacity, is the Attorney General of the State of Alabama ("Attorney General"). Defendant Marshall and Attorney General staff wrote the Protocol. Moreover, Defendant Marshall is responsible for starting the process of setting an execution date by filing a motion with the Alabama Supreme Court. Defendant Marshall designates the method of execution in those motions.

8.     All Defendants are being sued in their official capacities. The Defendants are citizens and residents of the State of Alabama.

9.     At all times relevant to this action, Defendants acted under the color of state law and their actions constituted state action.

## JURISDICTION AND VENUE

10.    This is an action for declaratory and injunctive relief.

11.    This Court has jurisdiction pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 1331, 1343(a)(3), 2201, 2202, and 42 U.S.C. § 12133.

12.    Venue is appropriate in the Middle District of Alabama under 28 U.S.C. § 1391(b) as all Defendants, in their official capacity, reside in Alabama, and all the substantial events giving rise to the claims alleged herewith occurred in this venue.

4906-1223-1254.v2

## CASE OR CONTROVERSY

13.    There is a real and justiciable case or controversy between the parties.[2]

## ADMINISTRATIVE EXHAUSTION

14.    Mr. Boyd has no available administrative remedies, as "[t]he policies and procedures of the Department of Corrections for execution of persons sentenced to death shall be exempt from the Alabama Administrative Procedure Act, Chapter 22 of Title 41." Ala. Code § 15-18-82.1(g).[3]

## FACTUAL ALLEGATIONS

15.    Mr. Boyd is in the custody of ADOC and is currently being held at Holman under a sentence of death imposed by the State of Alabama. Mr. Boyd has been incarcerated since 1995.

16.    Mr. Boyd is subject to execution by the State of Alabama's Protocol.

### *Alabama's Nitrogen Hypoxia Protocol*

17.    In 2018, the Alabama Legislature authorized execution by an untested method: nitrogen hypoxia. Shortly thereafter, beginning June 1, 2018, death-sentenced prisoners were given 30 days to opt into the unseen Protocol or remain subject to execution by lethal injection. Mr. Boyd opted into the protocol in 2018. Mr. Boyd reserved his right to challenge the constitutionality of any Protocol

---

[2] This case does not challenge Mr. Boyd's conviction or sentence.

[3] *See also In re Alabama Lethal Injection Protocol,* 12-cv-00316-WKW (M.D. Ala. 2012), Doc. 354 at 5 (admitting "[n]o administrative grievance process is available for Plaintiffs or other death row inmates to challenge the procedures to be employed during their executions.").

4906-1223-1254.v2

Defendants adopted.  Moreover, neither at the time of opt-in nor at any point since, has the unredacted protocol been provided to Mr. Boyd.

18.    Five years later, in August 2023, Defendants declared themselves ready to implement the Protocol; in doing so they released a heavily redacted version of the Protocol.

19.    Based on the few details that Mr. Boyd can glean from the heavily redacted Protocol, it is clear that the consequences of attempting an execution by nitrogen hypoxia using the State's deficient Protocol will be dire. If not performed correctly, execution by nitrogen hypoxia can result in a botched execution that risks leaving Mr. Boyd with permanent injuries. For example, hypoxemia (low levels of oxygen in the blood), which can lead to hypoxia (low levels of oxygen in organs), can cause severe and permanent injuries short of death, including a persistent vegetative state, stroke, and the painful sensation of suffocation. Therefore, it is critical that the procedures the State employs are designed to reduce those risks to the lowest possible levels.

20.    When Mr. Boyd elected execution by nitrogen hypoxia in 2018, he did not agree to be executed without knowing the protocol, much less by the State using a heavily redacted Protocol that he had never seen and that was hastily introduced.

21.    The Protocol notes that the "Warden or Assistant Warden shall inspect the condition of each gas cylinder and verify that the volume of gas in each bank ... exceeds the minimum acceptable thresholds..." (Protocol, p. 6, 1 V. D. iv.)

22.     The Protocol notes that the "Warden, Assistant Warden, or Execution Team Captain will retrieve the mask assembly, connect it to the breathing gas tubing, and stow it in the execution chamber at the designated location." (Protocol, p. 14, ¶ IX. I. vi.)

23.     The Protocol requires "[t]he Warden or Assistant Warden [to] conduct a final visual inspection of the nitrogen hypoxia system and verify that it has been initialized/pressurized and that [REDACTED] lockout valves [REDACTED]." (Protocol, p. 15, ¶ X. A. i.) It further requires the Warden or Assistant Warden to perform a similar action as to the "breathing gas tubing." (Id.)

24.     The Protocol also notes that a "pulse oximeter will be placed and secured on the condemned inmate." (Protocol, p. 15, ¶X. A. iii.) It later notes that, after the mask is on the inmate's face, "the pulse oximeter will be monitored continuously for two minutes." (Protocol, p. 15, ¶X. A. vi.) Neither paragraph references who will perform these actions or their training or qualifications.

25.     Paragraph X. A. v., of the Protocol notes, "The mask will be placed and adjusted on the condemned inmate's face" and provides that the "Execution Team Captain verifies that the mask has been properly placed." There is no reference as to who is responsible for placing the mask on the individual or their training or qualifications. Further, there is no definition of "properly placed."

26.     The Protocol includes time-based criterion, including requiring that nitrogen be given to the inmate through a mask for 15 minutes or until 5 minutes after the prisoner shows a flat line on an EKG, whichever is longer. The medical

definition of death is not based on the duration of a hypoxic insult. There is no factual or medical basis for picking an arbitrary time on the clock to determine death. This invites the risk of causing significant brain and heart injury without death.

27.     Paragraph X. A. xv. of the protocol contains the first mention of an EKG. Unlike the pulse oximeter, there is no reference to when it will be placed on the inmate, or if it will be observed/ checked prior to the start of the execution. Nor does it identify anyone as responsible for those tasks who is qualified to interpret these EKG patterns or recognize artifacts due to faulty electrode contact.

28.     The protocol does not indicate the training levels, if any, of the individuals required to confirm a flatline indication on the EKG. The protocol does not provide for monitoring the accuracy of this equipment as the execution progresses.

29.     In paragraph I. D. vi., the Protocol notes, "It is likely that the manufacturers of these products do not know that their publicly available products were procured by ADOC."

30.     The Protocol calls for the use of a mask to deliver 99.999% pure nitrogen gas.

31.     The mask used in the Protocol is designed and intended to help workers breathe in oxygen-deficient environments or environments containing harmful gases or substances.

4906-1223-1254.v2

32.     The mask is neither designed for, nor intended to, deliver nitrogen gas for purposes of causing death. The onset of hypoxia triggers a cascade of physiological responses mediated by the sympathetic nervous system. This "fight-or-flight" response includes increased heart rate and blood pressure while the body attempts to compensate for the lack of oxygen by increasing circulation. Hypoxia also causes rapid and labored breathing as the respiratory system struggles to obtain oxygen, leading to air hunger (dyspnea), a profoundly distressing sensation.

### *The Protocol Is Facially Cruel and Unusual*

33.     To date, Defendants have executed five prisoners under the current Protocol: (1) Kenneth Eugene Smith; (2) Alan Eugene Miller; (3) Carey Dale Grayson; (4) Demetrius Terrence Frazier; and (5) Gregory Hunt.

34.     As further established below, each prisoner previously executed by the State's Protocol was observed to gasp for air and struggle against their harness for several minutes after the nitrogen would begin to flow.

35.     Each prisoner previously executed by the State's Protocol showed signs of conscious suffocation, terror, and pain.

36.     Contrary to the State's representations, none of the prisoners previously executed by the State's Protocol were observed to have experienced "unconsciousness within seconds"[4] of being deprived of oxygen, and rather, were

---

[4] Defs.' Post-Hr'g Br. in Opp'n to Pl. Smith's Mot. for Prelim. Inj., *Smith v. Hamm, et al.,* No. 2:23-cv-656-RAH (M.D. Ala. Dec. 29, 2023), Doc. 66 at 12.

conscious and struggling for around 2-6 minutes following administration of nitrogen.

37.     The consistency and commonality of these observations across multiple sources rules out the possibility of isolated observer bias, supporting the conclusion that elements of suffocation are inherent to the Protocol.

38.     Defendants' have represented that Mr. Smith's execution was "textbook", and that Mr. Miller's, Mr. Grayson's , Mr. Frazier's, and Hunt's went as expected.

39.     The Protocol does not provide for what to do in the event a prisoner remains conscious "within seconds" of nitrogen beginning to flow into the mask.

40.     Despite the proven flaws of the State's Protocol, no known changes or provisions have been added to avoid such suffocation, terror, and pain. Defendants Hamm and Raybon have made no changes to the Protocol to account for continued consciousness observed in Messrs. Smith, Miller, Grayson, Frazier and Hunt during their executions.

41.     Defendants' failure to modify the Protocol following the executions of Messrs. Smith, Miller, Grayson, Frazier, and Hunt shows it is designed to inflict superadded terror or pain, or that the state is deliberately indifferent to evidence that the Protocol inherently inflicts such superadded pain and terror.

42.     Only Defendant Hamm has the authority to alter, amend, or make exceptions to the Protocol and procedures governing the execution of death-sentenced inmates in the State of Alabama. Defendant Hamm is responsible for implementing the Protocol.

43.     Defendant Marshall, in his sole discretion, selects whom to request permission to execute.

44.     Defendant Raybon, as statutory executioner, is responsible for ensuring the Protocol is carried out in the manner intended.

45.     The Protocol, as employed in the "textbook" execution of Kenneth Smith, and the "as expected" executions of Messrs. Miller, Grayson, Frazier and Hunt, will cause Mr. Boyd to be deprived of oxygen while he remains conscious until he dies, and to experience inescapable superadded pain and terror as a result of his conscious suffocation.[5]

46.     Depriving a conscious person of oxygen creates a "constitutionally unacceptable risk of suffocation." *Baze v. Kees,* 553 U.S. 35, 53 (2008).

47.     Notably, the American Veterinary Medical Association has banned the use of nitrogen as a method of euthanasia in dogs and most other animals because of the variable and distressing responses to nitrogen breathing. [6] The American Veterinary Association disallows the use of nitrogen hypoxia as a form of euthanasia for mammals because it causes an "anoxic environment that is distressing for some species." [7] It is accepted among veterinarians that using gas,

---

[5] *Suffocation (?),* Cambridge Dictionary Online,
https://dictionary.cambridge.org/us/dictionary/english/Suffocation (last visited July 16, 2025).

[6] Declaration of Philip E. Bickler, M.D., Ph.D, *Hoffman v. Westcott, et al.,* No 3:25-CV-00169-SDD-SDJ (M.D. La. Feb. 26, 2025), Doc. 4-5 at 74.

[7] Marty Roney, Nitrogen Gas Execution: Kenneth Smith Convulses for Four Minutes in Alabama Death, Chamber, Montgomery Advertiser (Jan. 25, 2024).

including nitrogen, to "euthanize companion animals like dogs and cats is inappropriate and cruel. This is reflected in the American Veterinary Medical Association Guidelines for the Euthanasia of Animals, which condemns the use of nitrogen for this purpose." [8]

### *The Execution of Kenneth Eugene Smith*

48.     Upon releasing the redacted protocol, Defendant Marshall selected Kenneth Eugene Smith ("Mr. Smith") to be the first person in history to be executed by nitrogen hypoxia.

49.     On January 25, 2024, Mr. Smith died after being subjected to Defendant Marshall's Protocol, administered by Defendants ADOC, Hamm, and Raybon.

50.     At Mr. Smith's execution, ADOC Captain Brandon McKenzie (Captain McKenzie) oversaw the execution team.

51.     Prior to Mr. Smith's death, Defendants Hamm, Raybon, Marshall, and ADOC represented to this Court that Alabama's nitrogen protocol would "cause unconsciousness within seconds" of nitrogen flowing into the mask.[9]

---

https://www.montgomeryadvertiser.com/story/news/local/alabama/2024/01/25/four-minutes-of-convulsions-kenneth-smith-executed-with-nitrogen-gas/72358038007/.

[8]Declaration of Larence Lee Capone Jr. (DVM), *Hoffman v. Westcott, et al.,* No 3:25-CV-00169-SDD-SDJ (M.D. La. Feb. 23, 2025), Doc. 4-6 at 2.

[9]  Defs.' Post-Hr'g Br. in Opp'n to Pl. Smith's Mot. for Prelim. Inj., *Smith v. Hamm, et al.,* No. 2:23-cv-656-RAH (M.D. Ala. Dec. 29, 2023), Doc. 66 at 12.

52.    Defendants Hamm, Raybon, Marshall and ADOC knew, or should have known, that increased levels of oxygen in their nitrogen execution system would cause the execution to last significantly longer than "seconds."

53.    Defendants Hamm, Raybon, Marshall, and ADOC did not follow the manufacturer's instructions and "fit" the mask specifically to Mr. Smith or test the fit of the mask.

54.    Many witnesses were present for Mr. Smith's execution, including Mike Sennett ("Mr. Sennett"), one of victim Elizabeth Sennett's sons, Mr. Smith's wife, Deanna Smith (now widow), his son, Steven Tiggleman, his longtime attorney Robert Grass, his spiritual advisor Jeff Hood, and independent journalist Lee Hedgepeth of Tread.

55.    Five statutory[10] media witnesses were present: (1) Kim Chandler of the Associated Press; (2) Ralph Chapoco of the Alabama Reflector; (3) Ivana Hrynkiw of AdvanceLocal; (4) Lauren Layton of News 19 (WHNT); and (5) Marty Roney of the Montgomery Advertiser.

56.    At Mr. Smith's execution, Captain McKenzie was responsible for conducting the Protocol's consciousness check.

57.    According to Captain McKenzie, Mr. Smith remained conscious for several minutes after the nitrogen began following into his mask.

---

[10]  *See* Ala. Code § 15-18-83(a)(6); ADOC Execution Procedures XI(A)(vii)(2) (Aug. 2023) ("News media representatives who were unable to witness the execution will be provided an opportunity to ask questions of the news media representatives who attended the judicial execution as statutory witnesses.").

58. According to first-hand witnesses present at the execution, after the nitrogen began flowing and while he was still conscious, Mr. Smith writhed and struggled against the restraints for several minutes.

59. Mr. Smith was conscious for several minutes after he was deprived of all oxygen.

60. At Defendant ADOC's post-execution press conference, one of the victim's sons, Mr. Sennett, said Mr. Smith looked like "a fish out of water for some time[.]" Mr. Sennett further explained, "We were told by some people that worked [in the prison system] that he'd take two or three breaths and he'd be out and gone. That ain't what happened. After about two or three breaths, that's when the struggling started."[11] After he described "all that struggling and jerking and trying to get off that table," Mr. Sennett said a nitrogen hypoxia execution is "just something I don't ever want to see again."[12]

61. The Reverend Jeff Hood, Mr. Smith's spiritual adviser, who was at Mr. Smith's side for the execution, and said prison officials in the room "were visibly surprised at how bad this thing went," and "We didn't see somebody go unconscious in 30 seconds. What we saw was minutes of someone struggling for his life. We saw

---

[11] Nicholas Bogel-Burroughs, <u>A Select Few Witnessed Alabama's Nitrogen Execution. This Is What They Saw</u>, The New York Times (Feb. 1, 2024), https://www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html.

[12] *Id.*

minutes of someone heaving back and forth. We saw spit. We saw all sorts of stuff develop from his mask."[13]

62.    Attorney Robert Grass testified before the Kansas State legislature that "At a minimum, Mr. Smith did not appear to be unconscious in seconds and dead in minutes as Alabama predicted." He further explained that Mr. Smiith "appeared to be having convulsions or seizures. His eyes rolled up. His legs moved violently up and down several times. His head thrust forward and back to the gurney several times. He clenched his fists and his arms and body strained against the gurney restraints."[14]

63.    Marty Roney of the Montgomery Advertiser reported that between 7:57 p.m. local time and 8:01 p.m, "Smith writhed and convulsed on the gurney. He took deep breaths, his body shaking violently with his eyes rolling in the back of his head." Roney's report continued: "Smith clenched his fists, his legs shook … He seemed to be gasping for air. The gurney shook several times."[15]

64.    Lee Hedgepeth of Tread wrote "Around 7:57, Smith began to react to the nitrogen flowing into the mask covering his face. He began thrashing against

---

[13] Ralph Chapoco, <u>Kenneth Eugene Smith Executed by Nitrogen Gas for 1988 Murder-for-Hire Scheme</u>, Alabama Reflector (Jan. 25, 2024), <u>https://alabamareflector.com/2024/01/25/kenneth-eugene-smith-executed-by-nitrogen-gas-for-1988-murder-for-hire-scheme/</u>.

[14] KS H.B 2782, Statement of Robert M. Grass (Feb 15, 2024).

[15] Marty Roney, <u>Nitrogen Gas Execution: Kenneth Smith Convulses for Four Minutes in Alabama Death Chamber</u>, Montgomery Advertiser (Jan. 25, 2024), <u>https://www.montgomeryadvertiser.com/story/news/local/alabama/2024/01/25/four-minutes-of-convulsions-kenneth-smith-executed-with-nitrogen-gas/72358038007/</u>.

the straps, his whole body and head violently jerking back and forth for several minutes. … Soon, for around a minute, Smith appeared heaving and retching inside the mask… By around 8:00, Smith's struggle against the restraints had lessened, though he continued to gasp for air. Each time he did so, his body lifted against the restraints."[16] She later stated "This was the fifth execution that I've witnessed in Alabama, and I've never seen such a violent execution or a violent reaction to the means of execution."[17]

65.     Mr. Smith's responses after the nitrogen began flowing showed the signs of conscious suffocation. Mr. Smith's autopsy results establish he suffered from negative pressure pulmonary edema ("NPPE").

66.     NPPE occurs when a person attempts to breath while the upper airway is obstructed, causing fluid to be drawn from blood vessels in the alveoli.

67.     An individual experiencing panic and sensing an inability to breathe while also being denied oxygen will experience a constricted airway like an upper airway obstruction. This creates the NPPE observed in Mr. Smith's autopsy findings.

---

[16] Lee Hedgepeth, 'Never Alone': The Suffocation of Kenneth Eugene Smith, Tread by Lee (Jan. 26, 2024), https://www.treadbylee.com/p/never-alone-the-suffocation-of-kenneth.

[17] Abigail Brooks and Erik Ortiz, Alabama AG Calls First Nitrogen Gas Execution 'Textbook,' but Witnesses Say Inmate Thrashed in Final Moments, NBC News (Jan 26, 2024), https://www.nbcnews.com/news/us-news/alabama-ag-calls-first-nitrogen-gas-execution-textbook-witnesses-say-i-rcna135810.

### *The Execution of Alan Eugene Miller*

68.    On September 26, 2024, Defendants Hamm and Raybon executed Alan

Eugene Miller ("Mr. Miller") using the Protocol.

69.    At Mr. Miller's execution, Captain McKenzie oversaw the execution team.

70.    Captain McKenzie did not determine Mr. Miller was unconscious until

approximately six minutes after the nitrogen began flowing.

71.    As described by those present at Mr. Miller's execution, after the nitrogen

began flowing, and while he was still conscious, Mr. Miller writhed and struggled

against the restraints for several minutes, and showed signs of conscious suffocation.

72.    Kim Chandler of the Associated Press reported that Mr. Miller "shook

and trembled on the gurney for about two minutes with his body at times pulling

against the restraints. That was followed by about six minutes of periodic gulping

breaths before he became still."[18] Ms. Chandler further noted that "The shaking

exhibited by Miller was similar to what was seen at the first nitrogen gas

execution…"[19]

73.    Ivana Krynkiw of AdvanceLocal, who was present at the execution,

wrote "Miller then took deep breaths and lifted his head off the gurney several times at

---

[18] Kim Chandler, <u>Alabama Puts Man Convicted of Killing 3 to Death in the Country's Second Nitrogen Gas Execution</u>, Associated Press (Sept. 26, 2024), <u>https://apnews.com/article/alabama-nitrogen-execution-alan-miller-29d624a776d5daa265f376a79ae2f86b</u>.

[19] *Id.*

6:18 p.m. He struggled against the restraints on the gurney, shaking and trembling for about two minutes. Miller then gasped off and on for about six minutes."[20]

74.    Marty Roney of the Montgomery Reporter wrote "Miller gasped, shook and struggled against his restraints for two minutes after the gas apparently began to flow. He continued to gasp and move for several more minutes after apparently losing consciousness…"[21]

75.    Gladys Bautista of WVTM13, also present, wrote "At 6:18 p.m., the gas started to flow. This is when Miller began to take deep breaths. He lifted his head off the gurney several times and struggled against the restraints. He was trembling and shaking. Those movements continued for roughly two minutes. At 6:19 p.m., Miller appeared to lose consciousness but the movements continued. Everyone in the room was completely silent. At 6:20, Miller gasped, and his head moved. At 6:21, Miller took a large gasp for air. At 6:22, another smaller gasp. For the next two to three minutes, Miller continued to periodically gasp for air and lift his head from the gurney."[22]

76.    Upon information and belief, Mr. Miller's autopsy has not been released.

---

[20] Ivana Hrynkiw, <u>Alabama Inmate Alan Miller Executed with Nitrogen Gas Thursday for 1999 Shootings</u>, AdvanceLocal (Sept. 26, 2024), <u>https://www.al.com/news/2024/09/alabama-inmate-alan-miller-set-to-be-executed-with-nitrogen-gas-thursday-for-1999-shootings.html</u>.

[21] Marty Roney, <u>Alabama Executes Alan Eugene Miller with Nitrogen Gas</u>, Montgomery Advertiser (Sept. 26, 2024), https://www.montgomeryadvertiser.com/story/news/crime/2024/09/26/alabama-executes-alan-eugene-miller-with-nitrogen-gas/75360739007/.

[22] Gladys Bautista, <u>Witnessing Alan Miller's Execution: A Firsthand Account from Alabama's Death Chamber</u>, WVTM13 (Sept. 29, 2024) https://www.wvtm13.com/article/alan-miller-execution-alabama-witness-final-words/62415048.

4906-1223-1254.v2

77.     Regardless of whether Mr. Miller suffered from NPPE, he was consciously suffering for several minutes after he was deprived of all oxygen.

### *The Execution of Carey Dale Grayson*

78.     On November 21, 2024, Defendants Hamm and Raybon executed Carey Dale Grayson (Mr. Grayson) using the Protocol.

79.     At Mr. Grayson's execution, Captain McKenzie oversaw the execution team.

80.     As described by those present at the execution, after the nitrogen began flowing, and while he was still conscious, Mr. Grayson writhed and struggled against the restraints for several minutes, and showed the signs of conscious suffocation.

81.     Marty Roney of the Montgomery Reporter, present at the execution, explained that when the nitrogen began "Grayson's hands were tightly clenched. He took several deep gasps, shaking his head vigorously. He pulled his arms against the restraints. He took more deep gasps." He appeared to lose consciousness at 6:18 p.m., about six minutes after the gas began flowing."[23]

82.     Kim Chandler of the Associated Press, also present, reported "Grayson rocked his head, shook and pulled against the gurney restraints. He clenched his fist and appeared to struggle to try to gesture again. His sheet-wrapped legs lifted off the gurney into the air at 6:14 p.m. He took a periodic series of more than a

---

[23] Marty Roney, <u>Alabama Executes Carey Dale Grayson by Nitrogen Gas for Brutal 1999 Murder</u>, Montgomery Advertiser (Nov. 21, 2024), https://www.montgomeryadvertiser.com/story/news/crime/2024/11/21/alabama-executes-carey-dale-grayson-by-gas-for-brutal-1999-murder/76465482007/.

dozen gasping breaths for several minutes. He appeared to stop breathing at 6:21 p.m., and then the curtains to the viewing room were closed at 6:27 p.m."[24]

83.    Kent Falk of AdvanceLocal, also present, reported "The gas apparently started flowing at 6:12 p.m., followed by Grayson gasping and raising, shaking his head left to right. About 6:14 p.m., both of his legs on the gurney raised up. His movements slowed, but he had what appeared to be periodic gasps over the following six minutes when he stopped moving."[25]

84.    Dr. Brian G. McAlary, M.D. ("Dr. McAlary), a board certified anesthesiologist, also present, witnessed Mr. Grayson portray manifestations of significant anxiety and fear after the administration of nitrogen, including rapid eye movement, pupil dilation, and violent movements consistent with overt struggling. Dr. McAlary observed Mr. Grayson to appear conscious for at least 4 minutes, and not 30-40 seconds, following the administration of nitrogen.

85.    Upon information and belief, Mr. Grayson's autopsy has not been released yet.

86.    Regardless of whether Mr. Grayson suffered from NPPE, he was conscious for several minutes after he was deprived of all oxygen.

---

[24] Kim Chandler, Alabama carries out nation's third nitrogen gas execution on a man for a hitchhiker's killing, Associated Press (Nov. 22, 2024), https://apnews.com/article/death-penalty-nitrogen-execution-alabama-09450359e223a9d38a5fb24e87fcfb45.

[25] Kent Faulk, Alabama executes Carey Dale Grayson by nitrogen gas for 1994 murder, AdvanceLocal (Nov. 21, 2024), https://www.al.com/news/2024/11/live-updates-alabama-set-to-execute-carey-dale-grayson-by-nitrogen-gas-for-1994-murder.html.

### The Execution of Demetrius Terrence Frazier

87.     On February 2, 2025, Defendants Hamm and Raybon executed Demetrius Terrence Frazier (Mr. Frazier) using the Protocol.

88.     As described by those present at the execution, after the nitrogen began flowing, and while he was still conscious, Mr. Frazier writhed and struggled against the restraints for several minutes, and showed the signs of conscious suffocation.

89.     Kim Chandler of the Associated Press, present at the execution, reported "Frazier moved his outstretched palms in a swirling circular movement for the first minute or two. At 6:12 p.m., he stopped circling his hands. He appeared to grimace, quiver on the gurney and take a gasping breath. A minute later, he raised both legs several inches off the gurney and then lowered them. His breathing slowed at 6:14 p.m. to a series of sporadic breaths. He had no visible movement by about 6:21 p.m."[26]

90.     Ivana Krynkiw of AdvanceLocal, also present, reported "At approximately 6:12 p.m. Frazier clenched his face, and his nostrils flared, while his hands quivered. He appeared to say something, which was inaudible to the three witness rooms. His legs slightly lifted up off the gurney and he gasped. Then, his head

---

[26] Kim Chandler, <u>Alabama Puts Man to Death for a 1991 Murder in the Nation's Fourth Execution Using Nitrogen Gas</u>, Associated Press (Feb. 6, 2025), <u>https://apnews.com/article/alabama-execution-demetrius-frazier-nitrogen-gas-e1b391e1e157f2815be1baa248737778</u>.

rolled to the right side. Frazier exhibited sporadic gasping and shallow breathing until about 6:20 p.m."[27]

91.    Sara Clifton of the Montgomery Advertiser, also present, reported "Frazier appeared to struggle to breathe and seemed to clench the muscles in his face… Frazier appeared to breathe sporadically, with seemingly inconsistent amounts of time between breaths, and apparently slightly shuddering. Frazier's legs appeared to tense and raise a few inches off of the gurney, with his head seemingly lolling to the side. His arms seemed to tighten and fists clenched."[28]

92.    Gladys Bautista of WVTM-13, also present, reported "At approximately 6:12 p.m., Frazier clenched his face and his nostrils flared, while his hands quivered. His legs slightly lifted up off the gurney and he gasped. He had sporadic gasping and shallow breathing until about 6:20 p.m."[29]

93.    Upon information and belief, Mr. Frazier's autopsy has not been released yet.

---

[27] Ivana Hrynkiw, Alabama Inmate Demetrius Frazier Executed by Nitrogen Gas for 1991 Birmingham Slaying: 'Let's Go', AdvanceLocal (Feb. 6, 2025), https://www.al.com/news/2025/02/alabama-inmate-demetrius-frazier-set-to-die-by-nitrogen-michigan-governor-hasnt-acted.html.

[28] Sarah Clifton, Alabama Executes Demetrius Frazier by Nitrogen Gas for 1991 Murder, Montgomery Advertiser (Feb. 6, 2025), https://www.montgomeryadvertiser.com/story/news/local/alabama/2025/02/06/alabama-executes-demetrius-frazier-by-nitrogen-gas-for-1991-murder/78282236007/.

[29] Riley Conlon & Taylor Lang, 'Detroit Strong': Alabama Carries Out Execution of Inmate in Michigan's Custody, WVTM Birmingham, Alabama (Feb. 10, 2025), https://www.wvtm13.com/article/alabama-inmate-execution-michigan-lawsuit-1738878056/63692646.

94.     Regardless of whether Mr. Frazier suffered from NPPE, he was conscious for several minutes after he was deprived of all oxygen.

### The Execution of Jessie Hoffman

95.     On March 18, 2025, the State of Louisiana executed Jessie Hoffman ("Mr. Hoffman") using their nitrogen hypoxia protocol. The Louisiana nitrogen hypoxia protocol was modeled after and closely mirrors Alabama's Protocol.

96.     As described by those present at the execution, after the nitrogen began flowing, and while he was still conscious, Mr. Hoffman writhed and struggled against the restraints for several minutes, and showed signs of conscious suffocation, consistent with the prisoners executed by the State of Alabama's Protocol.

97.     John Simmerman of Nola.com, present at the execution, reported "Officials said in a briefing later that it [administration of nitrogen] happened at 6:21 p.m., and that the gas ran for 19 minutes… at 6:22 p., his breathing became uneven. His chest rose and he made a jerking motion. A minute later, Hoffman's body shook and his fingers twitched. He appeared to pull at the arms of the table, which is bolted into the ceramic tile floor of the cinder block chamber. Hoffman's hands began to clench. His head stayed turned to his right. His breathing slowed… his head was tilted back, teeth exposed in a grimace." [30]

---

[30] John Simerman, Jessie Hoffman's Final Moments Inside Louisiana's Execution Chamber at Angola, Nola.com (Mar. 19, 2025), https://www.nola.com/news/courts/jessie-hoffman-death-penalty-execution-nitrogen/article_4de95cb8-047c-11f0-91cc-d7c36246ff44.html#tncms-source=featured-2.

98.    Gina Swanson of WDSU, also present, reported "by 6:21 the pure nitrogen gas was already flowing through his mask. There were moments of shaking, twitching and some convulsions. His fists were clenched." [31]

99.    Upon information and belief, Mr. Hoffman's autopsy has not been released yet.

100.    Regardless of whether Mr. Hoffman suffered from NPPE, he was conscious for several minutes after he was deprived of all oxygen.

### *The Execution of Gregory Hunt*

101.    On June 10, 2025, Defendants Hamm and Raybon executed Gregory Hunt (Mr. Hunt) using the Protocol.

102.    After the nitrogen began flowing, and while he was still conscious, Mr. Hunt writhed and struggled against the restraints for several minutes.

103.    Kim Chandler of Associated Press, present at the execution, reported "At 5:57 p.m. Hunt briefly shook, gasped and raised his head off the gurney. He let out a moan at about 5:59 p.m. and raised his feet. He took a series of four or more gasping breaths with long pauses in between, and made no visible movements after

---

[31] Gina Swanson, <u>Louisiana Conducts First Nitrogen Hypoxia Execution</u>, WDSU News (Mar. 19, 2025), <u>https://www.google.com/search?q=gina+swanson+wdsu+jessie+hoffman&rlz=1C1GCGS_enUS1159US1159&oq=gina+swanson&gs_lcrp=EgZjaHJvbWUqCAgBEEUYJxg7MgYIABBFGDkyCAgBEEUYJxg7MgcIAhAuGIAEMgcIAxAAGIAEMg0IBBAuGK8BGMcBGIAEMgcIBRAAGIAEMgcIBhAAGIAEMgcIBxAAGIAEMgcICBAAGIAEMgcICRAAGIAE0gEIMjkzNWowajSoAgCwAgE&sourceid=chrome&ie=UTF-8#fpstate=ive&vld=cid:a423db72,vid:b1zACx42O8E,st:0</u>.

6:05 p.m. The shaking movements and gasps were similar to previous nitrogen executions in Alabama." [32]

104. Alex Gladden of Montgomery Advertiser, present at the execution, reported "5:56 p.m. Hunt began taking deep breaths. 5:57 p.m. He began gasping and lifted his head. His entire body began convulsing.5:59 p.m. Hunt turned his head and then lifted his head. Hunt's head fell back, and he groaned loudly. 6p.m. Hunt moved his head and gasped. He continued intermittently gasping for the next several minutes."[33] .

105. Savannah Tryens-Fernandes of AdvanceLocal, present at the execution, reported "at 5:57 p.m. Hunt's breathing became labored and he lifted his head up. A minute later, his legs began moving. At 5:59 p.m. Hunt's body began shaking and his head and legs lifted off the gurney. He appeared to groan, then fell back down shortly after and his breath became more shallow." [34]

106. Mr. Hunt responses after the nitrogen began flowing showed the signs of conscious suffocation.

---

[32] Kim Chandler, Alabama Executes A Man By Nitrogen Gas For the Beating Death of a Woman in 1988, (Jun. 10, 2025), Associated Press, https://apnews.com/article/execution-alabama-nitrogen-gas-1799b231099c2e260bee7f55b97fa31f.

[33] Alex Gladden, Alabama Executes Gregory Hunt for 1988 Murder of Karen Lane, (Jun. 10, 2025), Montgomery Advertiser, https://www.montgomeryadvertiser.com/story/news/crime/2025/06/10/alabama-completes-fifth-execution-by-nitrogen-hypoxia/84069592007/.

[34] Savannah Tryens-Fernandes, Alabama Executes Gregory Hunt for Brutal 1988 Walker County Murder, (Jun. 10, 2025) AdvanceLocal, https://www.al.com/news/2025/06/gregory-hunt-set-to-die-by-nitrogen-gas-in-alabama-for-brutal-1988-walker-county-murder.html.

107.    Upon information and belief, Mr. Hunt 's autopsy has not been released yet.

108.    Regardless of whether Mr. Hunt suffered from NPPE, he was conscious for several minutes after he was deprived of all oxygen.

### Mr. Boyd's Medical Conditions

109.    Mr. Boyd has had asthma all his life. He continues to experience symptoms of this condition on an ongoing basis. Mr. Boyd regularly experiences breathing problems and issues. He has sought and received medical treatment for this condition. Mr. Boyd's asthma will make his execution by the State's Protocol more painful and prolonged than someone without this medical condition.   Mr. Boyd's underlying medical condition makes the application of the Protocol especially cruel, producing a substantial risk of prolonged pain and suffering in Mr. Boyd based on his lung disease.

110.    Approximately 7-8 years ago, Mr. Boyd became afflicted with Vertigo. Mr. Boyd continues to experience symptoms of this condition on an ongoing basis. Mr. Boyd regularly experiences problems and issues and has sought and received medical treatment for this condition.  As part of his treatment, Mr. Boyd was prescribed Antivert for this condition and continues to take that medication.  Mr. Boyd's condition will make his execution by the State's Protocol more painful and prolonged than someone without this medical condition.

4906-1223-1254.v2

## **Mr. Boyd's Proposed Alternatives**

111.    Because Defendants' Protocol does not have sufficient safeguards to prevent conscious suffocation from happening, it violates the Eighth Amendment.

112.    To satisfy the pleading requirement of *Glossip v. Gross*, 576 U.S. 863 (2015), Mr. Boyd must provide options that are feasible and reduce the risk of an Eighth Amendment violation.

113.    Those options must be "sufficiently detailed" to show that the option is feasible and "readily implemented."[35]

114.    Mr. Boyd offers three readily available and feasible alternatives to Defendants' present Protocol. First, Mr. Boyd offers the firing squad protocol. Second, Mr. Boyd proposes hanging. And finally, Mr. Boyd proposes medical-aid-in-dying (MAID). [36] [37]

---

[35]   Mr. Boyd objects to the requirement that he must provide the state with a constitutional method to execute him. That said, he recognizes that providing such methods is required for him to maintain this action and does so without prejudice to his objection.

[36] Mr. Boyd understands that, in order to maintain his Eighth Amendment challenge to Defendants' Protocol in this case, he must "identify a known and available alternative method of execution that entails a lesser risk of pain." *Glossip v. Gross*, 135 S. Ct. 2726, 2731 (2015).  While complying with *Glossip*, Mr. Boyd objects to his being required to fulfill this "suicide burden" in order to challenge Defendants' Protocol as unconstitutional.  In doing so, Mr. Boyd does not waive any or all potential claims that his rights could be violated by maladministration of any such alternative method. Rather, Mr. Boyd pleads, as he must, that if the alternative methods of execution functioned properly and were administered properly, such executions will not create a substantial risk of unconstitutional pain and suffering. Mr. Boyd also notes that the constitutional inquiry in this case is fact-intensive, and requires judicial review of each unique protocol.

[37] To the extent Defendants may assert that any of these alleged alternative methods is unavailable or not readily implementable, Mr. Boyd expressly reserves the right to conduct discovery of Defendants on the subject of available and implementable alternatives and to amend his pleading to offer additional or other proposed alternatives.

4906-1223-1254.v2

### *Method One: Firing Squad*

115.    One such alternative which is both known and available, is what is commonly referred to as the firing squad.[38] Both Utah and Oklahoma use or could use the firing squad, which makes it a known alternative. Use of a firing squad based on an existing protocol from one of these states is "available" because of instant and certain nature of death through this method.

116.    For instance, Utah's protocol contemplates five trained shooters, four of whose guns are loaded and the fifth loaded with a non-lethal wax bullet. Both of these other states evaluated and approved the firing squad as a method of execution through the legislative process, as states, including Defendants, are fully capable of doing. Use of a firing squad, a known and available alternative based on one of these other states' protocols, would entail a lesser risk of pain than the substantial risk of severe pain Mr. Boyd faces under Alabama's existing protocol.

117.    This is so even though firing squad executions – while more unpleasant to observe than nitrogen hypoxia, and while described as "barbaric" – are viewed as having a record of relative speed and certainty for the condemned, whose constitutional rights are at stake. The firing squad causes death with

---

[38] The United States Supreme Court has held in *Nance v. Ward*, that under §1983, prisoners may propose an alternative method for execution that is not currently authorized by the State's death-penalty statute. *Nance v. Ward*, No. 21-439 (U.S. June 23, 2022) ("A prisoner who challenges a State's proposed method of execution under the Eight Amendment must identify a readily available alternative method that would significantly reduce the risk of severe pain. If the prisoner proposes a metho already authorized under state law, the Court has held that his claim can go forward under 42 U.S.C §2983m rather than in habeas. But the prisoner is not confined to proposing a method already authorized under state law; he may ask for a method used in other states.") (internal citation omitted).

- 27 -

minimal pain and suffering as the execution would cut off circulation to the brain, resulting in rapid and profound cessation of cognitive brain activity in a time frame of no more than 3-4 seconds. [39] Following bullet impact, this causes loss of consciousness almost immediately, and this would render the condemned insensible to pain from that point onward.[40]

### *Method Two: Hanging*

118.    Alternatively, another known and available alternative method is hanging. Certain states, including Delaware, New Hampshire, and Washington, use or could use hanging as a method of execution, making it a known alternative. Hanging based on an existing protocol from one of these states is available because there are no impediments to obtaining the required materials. Each of these other states evaluated and approved hanging as a method of execution through the legislative process, as states, including Alabama, are fully capable of doing.

119.    Use of hanging, a known and available alternative based on one of these other states' protocols, would entail a lesser risk of pain than the substantial risk of severe pain Mr. Boyd faces under Alabama's existing protocol.

### *Method Three: Medical-Aid-In-Dying (MAID)*

120.    Alternatively, another known and available method is medical-aid-in-dying (MAID), also known as Death with Dignity.

---

[39] James Williams, <u>Efficacy and Feasibility of Firing Squad as Means of Execution</u>, (Feb. 19. 2025), *Hoffman v. Westcott, et al.,* No 3:25-CV-00169-SDD-SDJ (M.D. La.), Doc. 4-9 at 6.

[40] *Id.* at 7.

121.    MAID is currently legal in Oregon, Washington, California, Hawaii, Colorado, Vermont, Maine, New Jersey, Montana, Washington DC, and New Mexico.[41]

122.    The one method of MAID includes a drug combination of digoxin, diazepam, morphine, amitriptyline, and phenobarbital (DDMAPh) that is administered to a prisoner and causes death in a reliable and painless manner. DDMAPh is comprised of drugs that are widely available. It is a well described clinical practice and has published peer reviewed scientific literature in support of this method. The Academy of Aid-in-Dying Medicine now recommends DDMAPh for use in all MAID patients. [42]

123.    For all DDMAPh regimens, the median time to complete loss of consciousness is 5.8 minutes, but the patient loses some awareness much sooner. DDMPAh has been 100% effective at causing death. [43]

124.    Use of MAID, a known and available alternative based on one of these other states' protocols, would entail a lesser risk of pain than the substantial risk of severe pain Mr. Boyd faces under Alabama's existing protocol.

125.    There is no justification for Defendants to continue using Protocol that has proven to inflict severe superadded pain and terror associated with conscious

---

[41] Expert Report of Dr. Charles David Blanke, MD, FASCO, FAWM, *Hoffman v. Westcott, et al.,* No 3:25-CV-00169-SDD-SDJ (M.D. La. Feb. 26, 2025), Doc. 4-10 at 4.

[42] *Id.*

[43] *Id.*, at 5.

suffocation that inherently accompanies suffocation by the administration of pure nitrogen when these other alternative methods are available and known to Defendants.

## CLAIMS FOR RELIEF

### COUNT I
### (Declaratory Relief)

**On its face, the nitrogen hypoxia execution protocol violates the Eighth Amendment's right to be free from cruel and unusual punishment because the administration of pure nitrogen gas causes the prisoner to experience the extreme pain and terror of suffocation while still conscious, inflicting gratuitous suffering beyond what is constitutionally permitted.**

126.    Mr. Boyd incorporates paragraphs 1 through 125 in support of Claim One.

127.    Pursuant to 28 U.S.C. § 2201, an actual controversy exists between the parties concerning the State's Protocol.

128.    A declaratory judgment will completely resolve the controversy between the parties concerning the State's Protocol.

129.    The Eighth Amendment guarantees every person the right to be free from cruel and unusual punishment.

130.    A method of execution violates the Eighth Amendment if "the risk of pain associated with the State's method is substantial when compared to a known and available alternative." *Bucklew v. Precythe,* 587 U.S. 119, 134 (2019) (citations and internal quotation marks omitted).

- 30 -

131.    Defendants' Protocol fails to prevent the almost certain risk of agony associated with conscious deprivation of oxygen.

132.    Even if proper administration is assumed, the Protocol as written inherently causes conscious suffocation.

133.    Defendants' Protocol creates a substantial risk of unconstitutional pain during an execution.

134.    Numerous aspects of the Defendant's Protocol increase the risk of hypoxia induced injury, leaving the prisoner brain damaged, but not dead.

135.    Inadequate delivery of nitrogen has a high risk of causing hypoxia induced brain injury instead of death. If the flow of nitrogen were to stop while the prisoner is still alive, this could lead to brain damage from oxygen deprivation insufficient to kill the death sentenced prisoner.

136.    Causing such injury and leaving the prisoner alive violates the Eighth Amendment.

137.    *Baze* makes clear that conscious suffocation during an execution violates the Eighth Amendment. *Baze,* 553 U.S. at 53.

138.    Mr. Boyd's feasible and available alternative protocol for execution by firing squad eliminates the almost certain risk of agony associated with the conscious deprivation of oxygen under the present protocol.

139.    Mr. Boyd's feasible and available alternative protocol for execution by hanging eliminates the almost certain risk of agony associated with the conscious deprivation of oxygen under the present protocol.

- 31 -

140.    Thus, Mr. Boyd has established a valid Eighth Amendment violation, requiring an order prohibiting his execution under the present Protocol.

## COUNT II
## (Declaratory Relief)

**Defendant's failure to provide Mr. Boyd with a copy of the unredacted nitrogen hypoxia execution protocol violates the Fourteenth Amendment's right to Due Process.**

141.    Mr. Boyd incorporates paragraphs 1 through 140 in support of Claim Two.

142.    Pursuant to 28 U.S.C. § 2201, an actual controversy exists between the parties concerning the State's Protocol.

143.    A declaratory judgment will completely resolve the controversy between the parties concerning the State's Protocol.

144.    Procedural due process imposes constraints on governmental decisions that deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fourteenth Amendment.

145.    Mr. Boyd has such a liberty or property interest, which is an entitlement to notice and an opportunity to be heard with respect to any modification or amendment to Alabama's highly redacted Protocol where such modification or amendment impacts Mr. Boyd, which is fundamentally fair. Defendants have interfered with such rights as alleged herein.

146.    Defendants have only provided a highly redacted copy of their Protocol. In doing so, Defendants have withheld key facts from Mr. Boyd and his counsel that are necessary to support his claims.

147.    Behind a veil of secrecy, Defendants have refused to produce an unredacted version of the Protocol.  The DOC is specifically exempted from rulemaking requirements regarding nitrogen hypoxia.  Inmates may not file grievances respecting this process, and the protocol is kept secret. Because of the unfettered and unsupervised discretion of Defendants regarding the State's Protocol and procedures, no inmate can ever be certain of the protocol and procedures that the State will use to carry out his sentence.  Absent notice of the protocols, procedures, and training involved in the execution process, and any modifications thereto, and the opportunity to comment on or challenge these provisions, Defendants are violating Mr. Boyd's right to due process of law pursuant to the Fourteenth Amendment to the United States Constitution.

148.    Moreover, Mr. Boyd and inmates like him are prevented from effectively challenging the State's nitrogen hypoxia execution protocol because the State goes to great lengths to maintain the secrecy of the protocol during litigation challenging that protocol.

149.    Because Alabama can secretly change its nitrogen hypoxia execution protocol at any time, Mr. Boyd is denied the opportunity to be notified of changes to his manner of execution. Such secrecy further impedes Mr. Boyd's ability to

challenge the State's nitrogen hypoxia execution protocol, in violation of Mr. Boyd's Fourteenth Amendment due process rights.

150.   Mr. Boyd is entitled to those facts so he can pursue his claims in this Court.

151.   Defendants have violated Mr. Boyd's right to review and challenge Alabama's modified protocol changes as applied to him, in violation of Mr. Boyd's Fourteenth Amendment due process rights.

152.   Defendants have violated Mr. Boyd's Fourteenth Amendment rights to due process of law.

## COUNT III
### (Declaratory Relief)

**The nitrogen hypoxia execution protocol, *as applied* to Mr. Boyd violates the Eighth Amendment's right to be free from cruel and unusual punishment due to Mr. Boyd's heightened health risks from his Asthma and Vertigo.**

153.   Plaintiff incorporates paragraphs 1 through 152 in support of Claim Three.

154.   Pursuant to 28 U.S.C. § 2201, an actual controversy exists between the parties concerning the State's Protocol.

155.   A declaratory judgment will completely resolve the controversy between the parties concerning the State's Protocol.

156.   Executing Mr. Boyd by nitrogen hypoxia will very likely cause him to experience extreme psychological distress and panic due to his Asthma. An individual experiencing panic while also being denied oxygen will experience a

constricted airway like an upper airway obstruction. This will only be heightened due to Mr. Boyd's Asthma. Mr. Boyd may vomit, convulse, experience an inability to breathe, and/or otherwise suffer severe psychological pain.

157.    Based on his medical knowledge, Mr. Boyd's expert believes that the stress and anxiety of execution by nitrogen hypoxia, as well as the physiological impacts of hypoxia will trigger his Asthma. This will cause Mr. Boyd to suffer severe psychological pain in a way that violates the Eighth amendment.

158.    Executing Mr. Boyd by nitrogen hypoxia may cause him to experience extreme psychological distress and panic due to his Vertigo.

159.    Individuals with upper airway obstruction issues, which include but are not limited to sleep apnea, deviated septum, and asthma with wheezing, will not breathe as efficiently as individuals without these issues. This will cause the process to be delayed in a way that violates the Eighth amendment. A medical examination prior to execution would allow for recognition of such issues and permit the development of specific modifications to the process.

160.    Executing Mr. Boyd by nitrogen hypoxia would further superadd pain and suffering. Thus, Mr. Boyd has established a valid Eighth Amendment violation, requiring an order prohibiting his execution under the present nitrogen hypoxia protocol.

**COUNT IV**
**(Injunctive Relief)**

**As Defendants' nitrogen hypoxia execution protocol violates Mr. Boyd's Eighth and Fourteenth Amendments rights, a preliminary and permanent**

4906-1223-1254.v2

**injunction to prevent scheduling and enforcement of the execution by nitrogen hypoxia is necessary.**

161.    Plaintiff incorporates paragraphs 1 through 160 in support of Claim Four.

162.    Mr. Boyd seeks to enjoin Defendants and the State of Alabama setting a date for his execution or from executing him by nitrogen hypoxia under the procedures Defendants intend to employ because (i) Defendants' Protocol is facially unconstitutional (ii) Defendants' secrecy surrounding the Alabama Protocol violates Mr. Boyd's due process rights under the Fourteenth Amendment, and (iii) Defendants' Protocol is unconstitutional as applied to Mr. Boyd due to his pre-existing health conditions. As a result of all such reasons, Mr. Boyd faces a substantial and unacceptable and unnecessary risk of suffering excruciating pain during his execution in violation of the Eighth Amendment.

163.    Absent preliminary and permanent injunctions, Defendants will carry out the execution of Mr. Boyd pursuant to the Protocol in violation of Mr. Boyd's constitutional rights, as alleged herein.

164.    Mr. Boyd will be irreparably harmed by an unconstitutional execution pursuant to the Protocol.

165.    The harm to Mr. Boyd outweighs the harm to the State of a slight delay, and it is in the public interest to ensure that the Protocol is not unconstitutional before used on Mr. Boyd.

166.    The damage incurred by Mr. Boyd arising from an unconstitutional execution cannot be quantified in financial terms.

## PRAYER FOR RELIEF

For the above reasons, Mr. Boyd respectfully requests that this Court:

1)    Issue an order declaring Alabama's current Protocol facially unconstitutional under the Eighth Amendment;

2)    Issue an order declaring Alabama's current Protocol facially unconstitutional under the Fourteenth Amendment;

3)    Issue an order declaring Alabama's current Protocol unconstitutional as applied to Mr. Boyd under the Eighth Amendment;

4)    Issue an Order enjoining Defendants Hamm, Raybon, and ADOC, from executing Mr. Boyd using that protocol, enjoining Defendant Marshall from seeking an execution warrant for Mr. Boyd under that protocol, and enjoining Defendants from setting an execution timeframe; and

5)    Grant such other relief as this Court finds proper and just.

## <u>JURY DEMAND</u>

Mr. Boyd demands a trial by jury on all issues.


/s/ *Matthew C. Moschella*
Matthew C. Moschella (Massachusetts BBO #652885)
(*Pro hac vice* admission pending)
John C. La Liberte (Massachusetts BBO #556046)
(*Pro hac vice* admission pending)

4906-1223-1254.v2

David A. Michel (Massachusetts BBO #682122)
(*Pro hac vice* admission pending)
SHERIN AND LODGEN LLP
One Lincoln Street, 14th Floor
Boston, Massachusetts 02111
(617) 646-2000

Dated: July 16, 2025

- 38 -