# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| ANTHONY TODD BOYD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.   2:25-cv-529-ECM |
| | ) |
| JOHN Q. HAMM, | ) |
| Commissioner, Alabama | ) |
| Department of Corrections, | ) |
| | ) |
| TERRY RAYBON, Warden, | ) |
| Holman Correctional Facility, | ) |
| | ) |
| ALABAMA DEPARTMENT OF | ) |
| CORRECTIONS, | ) |
| | ) |
| and | ) |
| | ) |
| STEVE MARSHALL, | ) |
| Attorney General, State of Alabama, | ) |
| | ) |
| Defendants. | ) |

---

## DEFENDANTS' COMBINED MOTION TO DISMISS
## AND RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

---

Steve Marshall
*Attorney General*

Polly S. Kenny
*Assistant Attorney General*

Lauren A. Simpson
*Deputy Attorney General*

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130-0152
(334) 242-7300
August 8, 2025                    Polly.Kenny@AlabamaAG.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................... iv

INTRODUCTION .......................................................................... 1

STANDARDS OF REVIEW ............................................................ 3

PRISON LITIGATION REFORM ACT ............................................. 4

BACKGROUND ............................................................................ 5

    I.    Boyd's crime, litigation, and election of nitrogen hypoxia. ............... 5

    II.    Adoption of nitrogen hypoxia and subsequent litigation. .................. 7

        A.    Kenneth Smith ..................................................... 8

        B.    Alan Miller ......................................................... 8

        C.    Carey Grayson ..................................................... 9

        D.    Demetrius Frazier ............................................... 11

        E.    Gregory Hunt ..................................................... 13

        F.    Jessie Hoffman (Louisiana) ................................. 13

ARGUMENT FOR MOTION TO DISMISS ....................................... 14

    I.    Boyd's complaint is due to be dismissed as to Defendant Marshall. ............................................................................. 14

    II.    Boyd's complaint is due to be dismissed as to Defendant ADOC because ADOC is not a proper party. .................................... 17

    III.    Counts I and III should be dismissed because Boyd fails to state a claim. ........................................................................... 19

        A.    Method-of-execution claims. ................................. 20

B. Boyd does not plausibly allege a substantial risk of severe pain in Count I.......................................................... 23

    i. The risk of "conscious suffocation." ............................ 23

    ii. The risk that the flow of nitrogen will stop while Boyd is alive. ............................................................... 26

C. Boyd does not plausibly allege a substantial risk of severe pain in Count III........................................................... 27

D. Defects of Boyd's alternative methods of execution cause Counts I and III to fail as a matter of law. .............................. 29

    i. Firing squad. ................................................................ 30

    ii. Hanging....................................................................... 31

    iii. MAID......................................................................... 32

IV. Count II should be dismissed because Boyd fails to state a claim. ................................................................................ 34

V. Count IV should be dismissed because Boyd fails to state a claim. ................................................................................ 36

OBJECTION TO MOTION FOR PRELIMINARY INJUNCTION ......................................... 37

I. Boyd is not substantially likely to succeed on the merits. ................ 37

A. Counts I and III ...................................................................... 37

    i. Alabama's nitrogen hypoxia protocol provides a swift, painless execution................................................. 37

    ii. "Conscious deprivation of oxygen" is not "severe pain."........................................................................... 42

    iii. Boyd has no likelihood of success on his as-applied challenge. ...................................................................... 44

          iv.    Boyd's pleaded alternative methods of execution do not satisfy his burden, and ADOC has valid penological reasons to reject his proposals. .................. 46

    B.    Count II ...................................................................... 52

    C.    Count IV ..................................................................... 53

II.    The equities favor denial of the motion for preliminary injunction. ........................................................................... 54

    A.    Boyd's complaint is untimely. .................................. 54

    B.    Boyd has not shown a substantial threat of irreparable harm..................................................................... 60

    C.    Preventing the State from carrying out Boyd's lawfully imposed sentence would be adverse to the public interest. .... 61

CONCLUSION .......................................................................... 62

CERTIFICATE OF SERVICE .......................................................... 64

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................. 3, 24

*Barber v. Governor of Ala.*, 73 F.4th 1306 (11th Cir. 2023) .................. 3, 21, 29, 37

*Barr v. Lee*, 591 U.S. 979 (2020) .......................................................... 20, 21, 22, 49

*Baze v. Rees*, 553 U.S. 35 (2008) .................................................................... passim

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 3

*Bowles v. Desantis*, 934 F.3d 1230 (11th Cir. 2019) ................................................ 62

*Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320 (11th Cir. 2012) .................... 6

*Boyd v. Dunn*, 583 U.S. 1203 (2018) ......................................................................... 6

*Boyd v. State*, 715 So. 2d 825 (Ala. Crim. App. 1997) ......................................... 5, 61

*Boyd v. State*, 913 So. 2d 1113 (Ala. Crim. App. 2003) ............................................ 5

*Boyd v. Thomas*, 570 U.S. 920 (2013) ....................................................................... 6

*Boyd v. Warden, Holman Corr. Fac.*, 856 F.3d 853 (11th Cir. 2017) ....................... 6

*Brooks v. Warden*, 810 F.3d 812 (11th Cir. 2016) ................................. 4, 54, 56, 57

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ..................................................... passim

*Calderon v. Thompson*, 523 U.S. 538 (1998) .......................................................... 60

*City of Grants Pass v. Johnson*, 603 U.S. 520 (2024) ............................................. 22

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ............................................................... 15

*Doe v. Pryor*, 344 F.3d 1282 (11th Cir. 2003) ....................................................... 15

*Ex parte Bohannon*, 222 So. 3d 525 (Ala. 2016)......................................................6

*Ex parte Boyd*, 715 So. 2d 852 (Ala. 1998).................................................................5

*Ex parte Boyd*, No. 1030438 (Ala. May 27, 2005).....................................................5

*Ex parte Young*, 209 U.S. 123 (1908)......................................................................19

*Free v. Granger*, 887 F.2d 1552 (11th Cir.1989) ....................................................18

*Glossip v. Gross*, 576 U.S. 863 (2015) ............................................................ passim

*Graves v. Stone*, 25 F. Appx. 488 (8th Cir. 2002) ...................................................19

*Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894
    (11th Cir. 2024) ......................................................... 11, 22, 41, 43

*Grayson v. Hamm*, 145 S. Ct. 586 (2024)................................................................11

*Hamm v. Smith*, 143 S. Ct. 1188 (2023) ..................................................................29

*Hayden v. Ala. Dep't of Pub. Safety*, 506 F. Supp. 2d 944 (M.D. Ala. 2007) .........18

*Hill v. McDonough*, 547 U.S. 573 (2006)................................................... 54, 59, 61

*Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263 (11th Cir. 2020)......................5

*Hoffman v. Westcott*, 131 F.4th 332 (5th Cir. 2025)........................................ 14, 46

*Hoffman v. Westcott*, 145 S. Ct. 797 (2025) ...........................................................14

*Hoffman v. Westcott*, 3:25-cv-169, 2025 WL 763945
    (M.D. La. Mar. 11, 2025) ...................................................... 13, 46

*Hunt v. Alabama*, No. 24A1192 (U.S. June 10, 2025) ...........................................13

*Hurst v. Florida*, 577 U.S. 92 (2016).........................................................................6

*In re Kemmler*, 136 U.S. 436 (1890) .......................................................................20

*In re Ohio Execution Protocol Litig.*, 946 F.3d 287 (6th Cir. 2019)......................24

*In re Ohio Execution Protocol Litigation*, 881 F.3d 447 (6th Cir. 2018)......... 28, 41

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020).................... 15, 16

*Jones v. Allen*, 485 F.3d 635 (11th Cir. 2007)................................................. 56, 62

*Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288 (11th Cir. 2016)........... 34, 52

*Lawrence v. Florida*, 421 F.3d 1221 (11th Cir. 2005) ...........................................62

*Lewis v. Gov. of Ala.*, 944 F.3d 1287 (11th Cir. 2019)...........................................15

*Long v. Sec'y, Dep't of Corr.*, 924 F.3d 1171 (11th Cir. 2019) ...............................4

*Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003).....................................................18

*McNair v. Allen*, 515 F.3d 1168 (11th Cir. 2008)....................................................62

Memorandum Opinion, *Frazier v. Hamm*, 2:24-cv-732
    (M.D. Ala. Jan. 31, 2025) ...................................................................... passim

Memorandum Opinion, *Grayson v. Hamm*, 2:24-cv-376
    (M.D. Ala. Nov. 6, 2024) ....................................................................... passim

Memorandum Opinion, *Mills v. Hamm*, 2:24-cv-253
    (M.D. Ala. May 21, 2024)...........................................................................56

*Miller v. Marshall*, 2:24-cv-197, 2024 WL 2946093 (M.D. Ala. June 11, 2024).....9

*Mills v. Hamm*, 734 F. Supp. 3d 1226 (M.D. Ala. 2024) .......................................13

*Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917 (11th Cir. 2020) .................15

*Nance v. Ward*, 597 U.S. 159 (2022)............................................................. passim

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984).........................18

*Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317 (11th Cir. 2019)..... 21, 22, 33

*Quern v. Jordan*, 440 U.S. 332 (1979) ..................................................................18

*Rutherford v. McDonough*, 466 F.3d 970 (11th Cir. 2006).....................................62

*Schwab v. Sec'y, Dep't of Corr.*, 507 F.3d 1297 (11th Cir. 2007) ..........................62

*Sepulvado v. Jindal*, 729 F.3d 413 (5th Cir. 2013)........................................... 35, 53

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000)....................................................60

*Smith v. Ala. Dep't of Corr.*, 145 F. Supp. 2d 1291 (M.D. Ala. 2001) ...................18

*Smith v. Comm'r*, 24-10095, 2024 WL 266027 (11th Cir. Jan. 24, 2024) ...............8

*Smith v. Hamm*, 144 S. Ct. 414 (2024) ...............................................................8, 20

*Smith v. Hamm*, 2:23-cv-656, 2024 WL 116303 (M.D. Ala. Jan. 10, 2024)............8

*Smith v. Hamm*, 2:23-cv-656, 2024 WL 262867 (M.D. Ala. Jan. 24, 2024)............8

*Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198
    (11th Cir. 2021) ................................................................................................15

*Thompson v. Wainwright*, 714 F.2d 1495 (11th Cir. 1983)....................................62

*Trottie v. Livingston*, 766 F.3d 450 (5th Cir. 2014).......................................... 35, 53

*Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260 (11th Cir. 2014) ....... 34, 52

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) ................................. 18, 19

*Williams v. Allen*, 496 F.3d 1210 (11th Cir. 2007)..................................................62

*Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288 (11th Cir. 2020)......... 34, 55

*Woods v. Dunn*, 2:20-cv-58, 2020 WL 1015763 (M.D. Ala. Mar. 2, 2020) .... 34, 52

*Zink v. Lombardi*, 783 F.3d 1089 (8th Cir. 2015)............................................. 35, 53

**Statutes**

18 U.S.C. § 3626(a) ...................................................................4

42 U.S.C. § 1983 .....................................................................18

ALA. CODE § 14-1-1.1 .............................................................17

ALA. CODE § 14-1-1.2 .............................................................17

ALA. CODE § 15-18-82.1 ...........................................................7

ALA. CODE § 32-2-1 ...............................................................18

ALA. CODE § 7639 (1907) ........................................................31

**Rules**

ALA. R. APP. P. 8 ...............................................................4, 17

FED. R. CIV. P. 17 ..................................................................17

**Other Authorities**

JOHN LAURENCE, A HISTORY OF CAPITAL PUNISHMENT (1960) ..............................41

## INTRODUCTION

On June 27, 2018, Anthony Boyd chose nitrogen hypoxia to be his method of execution, and he has criticized it in his quarterly newsletter ever since.[1] Despite his awareness of the method, his knowledge that he would be subject to the method, and his nearly immediate opposition to it, Boyd did not sue for over seven years.

Even after the execution of Kenneth Smith in January 2024, while Boyd penned a lengthy screed condemning the method as "Hitleresque," "torturous, barbaric, heinous, cruel, atrocious, careless, and []reckless,"[2] he still did not sue. He could have asked his counsel—the same ones who have represented him since his 2005 habeas proceedings—to file a § 1983 action after Alan Miller's execution in September 2024, or Carey Grayson's in November 2024, or Demetrius Frazier's in February 2025, or even Gregory Hunt's execution in June 2025.

Instead, Boyd bided his time and waited until July 16, five weeks after the State moved for his execution, forcing this Court to consider a preliminary injunction because Boyd knows there is no time for full civil proceedings. Once more, the Court

---

1. *E.g.*, Ex. A, Anthony Boyd, *Letter from the Chairman*, 23-3 ON WINGS OF HOPE 2 (2019); Ex. B, 25-2 ON WINGS OF HOPE 2 (2021) (arguing that Alabama's adoption of nitrogen hypoxia makes it like Nazi Germany); Ex. C, 25-3 ON WINGS OF HOPE 2 (2021) (similar); Ex. D, 26-1 ON WINGS OF HOPE 2 (2022); Ex. E, 27-4 ON WINGS OF HOPE 2 (2023) (criticizing motion to execute Kenneth Smith; nitrogen method).
2. Ex. F, Anthony Boyd, *Letter from the Chairman*, 28-1 ON WINGS OF HOPE 2-3 (2024).

has been pushed into an emergency posture, and there is no good explanation other than the machinations of an inmate less concerned with the legitimacy of his claims than with throwing a spanner into the State's execution process.

Though Boyd's untimely complaint is new, his theories are not. For well over a year now, inmates (and their experts) have pointed to Kenneth Smith's so-called writhing and struggling to support claims of cruel and unusual "suffocation." They have claimed that nitrogen hypoxia causes unconstitutional emotional distress. And they have pointed to dicta in *Baze* to suggest the Supreme Court has already decided the issue. But those claims have resoundingly failed, including in appeals to two different courts of appeals and in the U.S. Supreme Court.

Boyd is no more likely to succeed on the merits than those before him who pressed the same theory. Like them, Boyd raises Eighth Amendment claims largely built on media accounts, *see* DE1:¶¶48-108, which this Court deemed "unreliable evidence." Memorandum Opinion at 25 n.19, *Frazier v. Hamm*, 2:24-cv-732 (M.D. Ala. Jan. 31, 2025), DE46. Like them, Boyd brings experts who will opine that nitrogen hypoxia is a physically painless way to die. And like them, Boyd raises alternatives—the firing squad, a multi-drug cocktail that can take hours to cause death,[3] or hanging, a method last used in the United States in 1996—that the State has ample

---

3. *Death With Dignity Preparations* at 3, END OF LIFE WA. (Aug. 31, 2021), tinyurl.com/3b87zsvc ("Some deaths…have occurred within five minutes of ingestion, but others have taken as long as 24 hours.").

penological reason to reject and that would not clearly reduce his pleaded risks. The only aspects of Boyd's claims that distinguish him—his asthma and vertigo—do not render Alabama's protocol unconstitutional as to him. For the reasons that follow, this Court should deny Boyd's motion for preliminary injunction and dismiss his complaint.

### STANDARDS OF REVIEW

A Rule 12(b)(6) motion tests the complaint against Rule 8's requirement of a statement "showing that the pleader is entitled to relief," as defined by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007). A court accepts only well-pleaded facts as true and is not bound by a plaintiff's legal assertions. *Iqbal*, 556 U.S. at 678. A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* The complaint must plead "factual content" sufficient "to draw the reasonable inference that [each] defendant is liable." *Id.* Allegations must be more than "speculative," *Twombly*, 550 U.S. at 555, and raise "more than a sheer possibility" of unlawful action, *Iqbal*, 556 U.S. at 678. There is a "line between possibility and plausibility," and "facts that are merely consistent with a defendant's liability…stop[] short." *Id.* (citation modified).

"[A] court may grant a stay of execution *only* if the moving party establishes that: '(1) he has a substantial likelihood of success on the merits; (2) he will suffer

3

irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; *and* (4) if issued, the injunction would not be adverse to the public interest.'" *Brooks v. Warden*, 810 F.3d 812, 818 (11th Cir. 2016) (citations omitted). There is a "strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Long v. Sec'y, Dep't of Corr.*, 924 F.3d 1171, 1176 (11th Cir. 2019).

## PRISON LITIGATION REFORM ACT

Boyd seeks prospective injunctive relief in the form of an order enjoining Defendants from executing him using the nitrogen hypoxia protocol, enjoining Defendant Marshall from seeking an execution warrant for Boyd, and enjoining Defendants from setting an execution timeframe.[4] DE1:37. The Prison Litigation Reform Act (PLRA) requires that any grant of injunctive relief be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means to correct that harm." 18 U.S.C. § 3626(a) (2024). Should it grant injunctive relief, a district court is required to perform this narrowness-necessity-and-non-intrusiveness analysis as to each separate form or basis of injunctive relief and explain its findings. *See Hoffer v. Sec'y, Fla.*

---

4. None of the named defendants set the execution timeframe, which is the responsibility of the Governor. ALA. R. APP. P. 8(d)(1).

4

*Dep't of Corr.*, 973 F.3d 1263, 1279 (11th Cir. 2020) ("[For] 15 separate forms of relief, the court must make—and explain—15 separate PLRA-related findings.").

The Supreme Court has identified the PLRA's "substantive and procedural limitations" as tools "to streamline 1983 actions and protect 'the timely enforcement of a sentence.'" *Nance v. Ward*, 597 U.S. 159, 174 (2022). The PLRA underscores that this Court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system" that would be caused by granting Boyd the prospective relief he requests. 18 U.S.C. § 3626 (2024).

**BACKGROUND**

## I.   Boyd's crime, litigation, and election of nitrogen hypoxia.

On July 31, 1993, Boyd and several codefendants kidnapped Gregory Huguley over $200. The men took him to a baseball field where they duct-taped Huguley to a bench, doused him with gasoline, set him on fire, and watched him burn to death. *Boyd v. State*, 715 So. 2d 825, 832 (Ala. Crim. App. 1997). Boyd was convicted of kidnapping-murder and sentenced to death. *Id.* at 831-32.

Boyd's direct appeal concluded in 1998. *Id.* at 852; *Ex parte Boyd*, 715 So. 2d 852 (Ala. 1998); *Boyd v. Alabama*, 525 U.S. 968 (1998) (mem.). His state postconviction (Rule 32) proceedings concluded in 2005, *Boyd v. State*, 913 So. 2d 1113 (Ala. Crim. App. 2003); *Ex parte Boyd*, No. 1030438 (Ala. May 27, 2005); and his

federal habeas proceedings concluded in 2013, *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1324 (11th Cir. 2012); *Boyd v. Thomas*, 570 U.S. 920 (2013) (mem.).

The State moved to set Boyd's execution in September 2014. Before the Alabama Supreme Court could grant the motion, however, the State moved to hold the matter in abeyance pending the resolution of *Glossip v. Gross*, 576 U.S. 863 (2015). The court granted that motion in March 2015.

In the meantime, Boyd filed a 42 U.S.C. § 1983 complaint in the Middle District in October 2014, arguing that Alabama's midazolam execution protocol was unconstitutional. Complaint, *Boyd v. Thomas*, 2:14-cv-1017 (M.D. Ala. Oct. 2, 2014), DE1. Following the release of *Glossip*, the State's motion to dismiss was granted. Memorandum Opinion and Order, *Boyd v. Myers*, 2:14-cv-1017 (M.D. Ala. Oct. 7, 2015), DE50. The Eleventh Circuit affirmed in May 2017. *Boyd v. Warden, Holman Corr. Fac.*, 856 F.3d 853 (11th Cir. 2017), and the Supreme Court denied certiorari, *Boyd v. Dunn*, 583 U.S. 1203 (2018) (mem.).[5]

By virtue of the date of his conviction, Boyd was originally sentenced to die by electrocution. When lethal injection was made Alabama's primary method of

---

5. Boyd continued to pursue state remedies, filing a successive Rule 32 petition in Talladega County in January 2017, in which he argued that his death sentence was unconstitutional under *Hurst v. Florida*, 577 U.S. 92 (2016). The circuit court summarily dismissed the petition in December 2017, pointing out that the Alabama Supreme Court had already rejected Boyd's *Hurst* claim in *Ex parte Bohannon*, 222 So. 3d 525 (Ala. 2016). Order, *Boyd v. State*, CC-1994-258.61 (Talladega Cnty. Cir. Ct. Dec. 27, 2017), Doc. 27.

execution in 2002, Boyd did not opt for electrocution. In March 2018, nitrogen hypoxia was added to Alabama's methods of execution, and inmates like Boyd had a thirty-day period that June in which they could affirmatively elect the new method. *See* ALA. CODE § 15-18-82.1(b)(2). Boyd did so on June 27, 2018.

The State moved for Boyd's execution for a second time on June 11, 2025. The Alabama Supreme Court authorized the execution on July 30, 2025.

**II.    Adoption of nitrogen hypoxia and subsequent litigation.**

In August 2023, ADOC adopted a protocol for carrying out judicial executions by nitrogen hypoxia. The "crux" of the protocol is that it administers "pure nitrogen gas…through an industrial respirator mask" until the inmate dies. Memorandum Opinion at 4, *Grayson v. Hamm*, 2:24-cv-376 (M.D. Ala. Nov. 6, 2024), DE95. EKG machines and pulse oximeters monitor the inmate's condition. *Id.*

Alabama has successfully used nitrogen hypoxia to carry out the sentences of Kenneth Smith (Supreme Court denied stay), Alan Miller (settled), Carey Grayson (Supreme Court denied stay), Demetrius Frazier (did not appeal denial of preliminary relief), and Gregory Hunt (did not challenge the method). Louisiana has used a similar hypoxia protocol to execute Jessie Hoffman (Supreme Court denied stay after Fifth Circuit vacated preliminary injunction).

### A.   Kenneth Smith

Smith elected nitrogen hypoxia but challenged the method on two grounds. First, Smith and multiple experts asserted that due to Smith's PTSD, he would vomit in the mask during the execution and then choke to death on his vomit before dying of hypoxia. *See, e.g.*, *Smith v. Hamm*, 2:23-cv-656, 2024 WL 262867, at *1 (M.D. Ala. Jan. 24, 2024). Second, Smith and one of his experts, Dr. Philip Nitschke, asserted that ADOC's mask would not produce a tight seal. *Smith v. Hamm*, 2:23-cv-656, 2024 WL 116303, at *18 (M.D. Ala. Jan. 10, 2024). Finding each risk highly speculative, Judge Huffaker denied Smith's motion for preliminary injunction. *Id.* at *20. The Eleventh Circuit affirmed, and the Supreme Court denied certiorari. *Smith v. Comm'r*, 24-10095, 2024 WL 266027 (11th Cir. Jan. 24, 2024); *Smith v. Hamm*, 144 S. Ct. 414 (2024) (mem.). Smith was executed on January 25, 2024.

### B.   Alan Miller

The State sought Miller's execution warrant on February 21, 2024. Miller, too, challenged nitrogen hypoxia despite having elected it. Among other things, he argued that "a trained medical professional" should place and hold the mask, supervise the flow of nitrogen, and respond if anything "goes awry." Complaint ¶193, *Miller v. Marshall*, 2:24-cv-197 (M.D. Ala. Mar. 9, 2024), DE1. Miller alleged that the mask would not fit his large face, that ADOC should use "medical grade nitrogen," and that a "tranquilizing medication in pill form" would "reduce thrashing."

*Id.* In an order dismissing two counts but permitting Miller's Eighth Amendment claim to proceed, Judge Huffaker found the surviving allegations to be "noticeably lean on factual detail" and "barely…plausible." *Miller v. Marshall*, 2:24-cv-197, 2024 WL 2946093, at *7 (M.D. Ala. June 11, 2024).

Miller sought preliminary injunctive relief and received copious discovery. He had a team of two major law firms and Dr. Phillip Bickler, who is Boyd's expert as well. *See* DE11-1. Miller received access to ADOC personnel and documents and deposed nearly ten witnesses. He ultimately settled with the State and dismissed his lawsuit. *See* Joint Stipulation of Dismissal, *Miller v. Marshall*, 2:24-cv-197 (M.D. Ala. Aug. 5, 2024), DE79. Miller was executed on September 26, 2024.

### C.    Carey Grayson

After the State moved for Grayson's execution, he challenged ADOC's hypoxia protocol in June 2024. *See* Complaint, *Grayson v. Hamm*, 2:24-cv-376 (M.D. Ala. June 28, 2024), DE1. Grayson alleged that with "proper administration," nitrogen hypoxia would cause an inmate to "lose consciousness within seconds" and die within "minutes" without any "pain or discomfort." *Id.* ¶101. But ADOC's protocol would result in "unconstitutional pain," he claimed, because (1) the inmate would not be rendered unconscious prior to the administration of nitrogen gas, causing "anguish," *id.* ¶¶105, 111; (2) excess oxygen might enter the mask and prolong the execution, *id.* ¶119; (3) the protocol does not call for a medical examination to diagnose

issues like sleep apnea that could prolong the execution, *id.* ¶125; and (4) the execution team is unqualified to monitor the pulse oximeters and EKGs used during the execution, *id.* ¶¶128, 129. Grayson later amended his complaint, alleging that Smith's autopsy suggested negative pressure pulmonary edema (NPPE). Amended Complaint, *Grayson v. Hamm*, 2:24-cv-376 (M.D. Ala. Aug. 30, 2024), DE42.

Grayson moved for a preliminary injunction and received limited expedited discovery. Motion for Preliminary Injunction, *Grayson v. Hamm*, 2:24-cv-376 (M.D. Ala. Aug. 20, 2024), DE30; Order, *Grayson v. Hamm*, 2:24-cv-376 (M.D. Ala. Sept. 18, 2024), DE62. Judge Huffaker held a comprehensive, two-day hearing on Grayson's motion. The court received over fifty exhibits, including numerous case reports and articles on inert gas asphyxiation and media reports describing the Smith and Miller executions. Memorandum Opinion, *Grayson*, DE95:6-7. The court heard live testimony from ten witnesses, including each side's expert, the medical examiner who conducted Smith's autopsy, and multiple State employees who witnessed the Smith and/or Miller executions. *Id.* at 7-9. The court denied Grayson's motion for a preliminary injunction, finding that his claim fell "well short" of the Eighth Amendment standard; Grayson presented "a speculative parade of highly unlikely events," *id.* at 44, and the State's expert, Dr. Joseph Antognini, was deemed "more credible and persuasive" than Grayson's expert Dr. Brian McAlary (also one of Boyd's experts, *see* DE11-4). *Id.* at 51. The Eleventh Circuit affirmed unanimously in a

published opinion, *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894 (11th Cir. 2024), the Supreme Court denied certiorari, *Grayson v. Hamm*, 145 S. Ct. 586 (2024) (mem.), and Grayson was executed on November 21, 2024.

### D.     Demetrius Frazier

Like Grayson, Frazier waited until the State moved for his execution to challenge the hypoxia protocol in November 2024. Complaint, *Frazier v. Hamm*, 2:24-cv-732 (M.D. Ala. Nov. 15, 2024), DE1. His complaint relied heavily on allegations of what lay witnesses reported about the executions of Smith and Miller. As for alternatives to hypoxia, Frazier's counsel proposed two: the administration of midazolam prior to nitrogen hypoxia, or else the lethal injection of ketamine and fentanyl (the latter of which he ultimately abandoned). *Id.* at 13-16. Otherwise, his complaint was substantially similar to Grayson's.

This Court held a hearing on Frazier's motion for preliminary injunction in January 2025, at which the Court heard testimony from Dr. McAlary, Dr. Antognini, and Commissioner Hamm. The Court denied Frazier's motion for preliminary injunction, finding the lay witness accounts "insufficiently reliable," Memorandum Opinion at 25, *Frazier*, DE46 (crediting Dr. Antognini over Dr. McAlary); *id.* (noting that "the State present[ed] credible evidence that Smith held his breath during his execution, thereby prolonging it"); *id.* n.20, and ultimately finding:

> On this record, Frazier has not established that the Protocol very likely
> causes needless psychological suffering, superadds psychological pain,

or creates a substantial risk of serious psychological harm. While the Court does not doubt that Frazier likely will experience some psychological pain before and during his execution, the Court finds that Frazier has failed to meet his burden to show that the Protocol creates a substantial risk of serious psychological harm over and above what is inherent in any execution. Consequently, Frazier fails to establish a substantial likelihood of success on the merits of his Eighth Amendment claim.

*Id.* at 26-27. As for Frazier's proposed alternative with midazolam, the Court found that "Frazier's submissions are insufficient to support a finding that rendering him unconscious sooner through sedation will significantly reduce a substantial risk of severe psychological pain," *id.* at 29, and credited the State's legitimate penological reasons for not adding a lethal injection component to a hypoxia execution, *id.* at 30.

But the Court denied Frazier's motion on the equities as well, emphasizing his unreasonable delay in filing his § 1983 action. *Id.* at 33-38. As the Court set forth:

Frazier's postconviction litigation timeline reflects that he filed this action over one year after the Protocol was publicly released, and he filed his request for a preliminary injunction (1) over sixteen months after the Protocol was released; (2) almost a year after Smith's execution; (3) almost four months after Miller's execution; (4) about three months after the State moved the Alabama Supreme Court to set his execution date; (5) two months after he filed this lawsuit; (6) one month after the Alabama Supreme Court granted the State's motion to set his execution date; and (7) fewer than four weeks before the beginning of his February 6, 2025 execution timeframe. And Frazier filed his motion for preliminary injunction only after this Court prompted him to do so.

*Id.* at 34-35 (footnote omitted). In closing, the Court once again "implored members of the bar to cease the all too common 'practice of filing lawsuits and requests for

12

stay of execution at the last minute where the facts were known well in advance.'"
*Id.* at 40 (quoting *Mills v. Hamm*, 734 F. Supp. 3d 1226, 1248 (M.D. Ala. 2024)).

Frazier did not appeal, and he was executed on February 6, 2025.

### E.    Gregory Hunt

Gregory Hunt elected nitrogen hypoxia, and the State moved to authorize his
execution in March 2025. Hunt never challenged nitrogen hypoxia; he instead filed
two "pro se" successive Rule 32 petitions in state circuit court and a stay application
in the U.S. Supreme Court, which was denied. *Hunt v. Alabama*, No. 24A1192 (U.S.
June 10, 2025) (mem.). Hunt was executed on June 10, 2025.

### F.    Jessie Hoffman (Louisiana)

Finding that no drug company would sell Louisiana the necessary drugs for
lethal injection, that State made nitrogen hypoxia its method of execution in spring
2024. Jessie Hoffman waited until February 2025, after Louisiana issued a death
warrant, to bring a new lawsuit, challenging nitrogen hypoxia and pleading the firing
squad and a Medical-Aid-in-Dying cocktail, DDMAPh, as alternative methods. The
parties engaged in expedited discovery, and the district court held an evidentiary
hearing, featuring testimony from Dr. Antognini and Dr. Bickler. The district court
found that "nitrogen hypoxia does not produce physical pain" and that a person
breathing nitrogen would "lose consciousness in less than one minute." *Hoffman v.
Westcott*, 3:25-cv-169, 2025 WL 763945, at *8 (M.D. La. Mar. 11, 2025). The court

13

enjoined Hoffman's execution, however, on its "common sense [belief] that the deprivation of oxygen to the lungs causes a primal urge to breathe and feelings of intense terror." *Id.* at *9. That alleged "psychological pain," which the court never compared to the baseline emotional distress of facing execution or the distress posed by any alternatives, was enough to find that Hoffman had "clearly shown" a "substantial likelihood of success on his Eighth Amendment claim. *Id.* at *10.

The Fifth Circuit swiftly reversed, explaining that the preliminary injunction was "not just wrong" but got "the Constitution backwards, because it's premised on the odd notion that the Eighth Amendment somehow requires Louisiana to use an admittedly *more* painful method of execution." *Hoffman v. Westcott*, 131 F.4th 332 (5th Cir. 2025). The Supreme Court denied Hoffman's stay application. *Hoffman v. Westcott*, 145 S. Ct. 797 (2025) (mem.). Hoffman was executed on March 18, 2025.

## ARGUMENT FOR MOTION TO DISMISS

Boyd's complaint names four defendants: ADOC Commissioner John Q. Hamm, Warden Terry Raybon, the Alabama Department of Corrections ("ADOC"), and Attorney General Steven Marshall. At the outset, Boyd lacks standing to state a claim against Marshall, and ADOC is not a proper defendant. As to all defendants, Boyd's claims fail to state a claim for which relief may be granted.

## I.    Boyd's complaint is due to be dismissed as to Defendant Marshall.

All four of Boyd's claims are due to be dismissed as to Defendant Marshall

due to lack of standing. To have Article III standing, a plaintiff must satisfy for each claim against each defendant that he: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc). "Because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting." *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc).

Standing requires the alleged injuries to be "fairly traceable to the *challenged action of the defendant*." *Doe v. Pryor*, 344 F.3d 1282, 1285 (11th Cir. 2003) (emphasis in original). As the Supreme Court has explained, "for purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021).

An injury is not fairly traceable to a state official if it is the result of actions taken independently by other officials. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253-54 (11th Cir. 2020). An official's supervisory authority is insufficient to establish traceability. *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1204 (11th Cir. 2021) (rejecting argument that standing as to "officials over whom the Attorney General has supervisory authority" establishes standing as to

"the Attorney General herself"). Nor is an injury redressable against state officials if they have exercised no control over the relevant state officials who did cause the alleged injury. *See id.*; *Jacobson*, 974 F.3d at 1254.

None of Boyd's claims are traceable to Defendant Marshall or redressable by an order against him. It is not the Attorney General but rather officials at ADOC who carry out executions and adopt protocols for each method of execution. Boyd's Eighth Amendment (facial and as-applied) claims have no connection to Defendant Marshall's role in the execution process, which is to move for an execution date to be set, represent State defendants in execution litigation like the present matter, and inform ADOC of any stays of execution. *See* DE11-3:16. While attorneys from Defendant Marshall's office may offer legal counsel to ADOC and its agents, it is ultimately the ADOC Commissioner who adopts execution protocols and determines whether executions proceed. Those are not Defendant Marshall's decisions, nor does he have authority over ADOC procedures.

Count I, DE1:¶¶ 126-40, should be dismissed as to Defendant Marshall because any potential injury from ADOC's execution protocol is not fairly traceable to him, and the claim is not redressable by Defendant Marshall because he has no authority to change the protocol.

Count II, *id.* ¶¶ 141-52, should be dismissed as to Defendant Marshall because the execution protocol is ADOC's document. Defendant Marshall is not the custodian of the execution protocol.

Count III, *id.* ¶¶ 153-60, like Count I, should be dismissed as to Defendant Marshall because any potential injury from ADOC's execution protocol is not fairly traceable to him, and Defendant Marshall has no authority to change the protocol.

Count IV, *id.* ¶¶ 161-66, should be dismissed as to Defendant Marshall because he has no part in "setting a date for [Boyd's] execution or…executing him by nitrogen hypoxia," *id.* ¶ 162. Defendant Marshall moved for Boyd's execution. He does not choose the date or carry out the execution. *See* ALA. R. APP. P. 8(d)(1).

## II.  Boyd's complaint is due to be dismissed as to Defendant ADOC because ADOC is not a proper party.

While Boyd has sued ADOC Commissioner Hamm and Warden Raybon in their official capacities, he has also named ADOC itself as a defendant in his § 1983 action. Counts I through III seek declaratory relief, while Count IV seeks injunctive relief. For Boyd to maintain these claims, the defendant must be capable of being sued under the law of the forum state. FED. R. CIV. P. 17(b)(3).

ADOC is an agency of the State of Alabama. *See* ALA. CODE §§ 14-1-1.1 (creating ADOC), 14-1-1.2 ("The department shall be an administrative department responsible for administering and exercising the direct and effective control over penal and corrections institutions throughout this state."). It has not consented to be

sued in federal court, and as such, it is not a proper defendant in this litigation.

> "[N]either a State, nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989). Furthermore, where a party attempts to sue a state in federal court, the Eleventh Amendment prohibits the federal court from exercising jurisdiction over the suit, except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984); *Quern v. Jordan*, 440 U.S. 332, 341 (1979). Neither one of these exceptions applies to Smith's § 1983 claims against the Department of Corrections. *See Quern*, 440 U.S. at 345; *Free v. Granger*, 887 F.2d 1552, 1557 (11th Cir.1989).

*Smith v. Ala. Dep't of Corr.*, 145 F. Supp. 2d 1291, 1296 (M.D. Ala. 2001) (citations edited). Section 1983 does not override the Eleventh Amendment immunity of States. *Quern*, 440 U.S. at 342. In *Hayden v. Alabama Department of Public Safety*, the Middle District explained why a State agency could not be sued under § 1983:

> Apart from the Eleventh Amendment, 42 U.S.C. § 1983 does not permit a state agency to be directly sued. Only a "person" can be held liable under § 1983. *See* 42 U.S.C. § 1983. In *Will v. Michigan*, the Supreme Court held that neither a state nor a governmental entity which is considered an "'arm[ ] of the state'" qualifies as a "person" under § 1983. 491 U.S. 58, 63-70 (1989). The status of the ADPS as an arm of the State of Alabama is not challenged. *See* Ala. Code § 32-2-1 (1975) (creating the ADPS); *see also Manders v. Lee*, 338 F.3d 1304, 1308, 1309 (11th Cir. 2003) (en banc) (setting forth factors to consider in determining whether an entity is an arm of the state). Applying *Will* to the facts of this case, the court finds that the ADPS is not a "person" under § 1983.
>
> […]
>
> Without citing any authority, Plaintiff argues that "the current state of the law is that a state may not be sued for damages, but may be sued for declaratory or injunctive relief" under §§ 1983 and 1985.

Because Plaintiff sues the ADPS for "injunctive relief only," Plaintiff contends that his §§ 1983 and 1985 claims against the ADPS survive the motion to dismiss. The court recognizes, as Plaintiff points out, that a government official is a "person" under § 1983 when sued in his or her official capacity for prospective declaratory or injunctive relief, *see Will*, 491 U.S. at 71 n.10 (citing *Ex parte Young*, 209 U.S. 123, 159-60, (1908)), and that such a suit can have the same result as if it were brought against the State itself. Nonetheless, the exception in *Will* does not apply to suits brought directly against a state agency. The ADPS simply is not a proper party for purposes of Plaintiff's claims brought pursuant to §§ 1983 and 1985. *Cf. Graves v. Stone*, 25 Fed. Appx. 488, 489-90 (8th Cir. 2002) (finding no merit to plaintiff's assertion that the *Ex parte Young* exception which permits injunctive relief suits against state officials sued in their official capacities "somehow makes the [state agency] a defendant in this case").

506 F. Supp. 2d 944, 948-50 (M.D. Ala. 2007) (citations edited or omitted; footnote omitted). As such, Boyd's complaint is due to be dismissed as to Defendant ADOC.

## III.    Counts I and III should be dismissed because Boyd fails to state a claim.

In Count I, Boyd contends that the ADOC's nitrogen hypoxia protocol "fails to prevent the almost certain risk of agony associated with conscious deprivation of oxygen," DE1:¶131, "inherently causes conscious suffocation," *id.* ¶ 132, "creates a substantial risk of unconscious pain during an execution," *id.* ¶ 133, and "increase[s] the risk of hypoxia induced injury, leaving the prisoner brain damaged, but not dead," *id.* ¶ 134. He further alleges that *Baze v. Rees*, 553 U.S. 35 (2008), "makes clear that conscious suffocation during an execution violates the Eighth Amendment." *Id.* ¶ 137. Finally, Boyd claims that two of his stated alternative methods,

firing squad and hanging, "eliminate[] the almost certain risk of agony associated with the conscious deprivation of oxygen under the present protocol." *Id.* ¶¶ 138-39.

In Count III, Boyd makes an as-applied Eighth Amendment challenge to the protocol, arguing that "nitrogen hypoxia will very likely cause him to experience extreme psychological distress and panic due to his Asthma," *id.* ¶156, and that "nitrogen hypoxia may cause him to experience extreme psychological distress and panic due to his Vertigo," *id.* ¶158.

Boyd has failed to state an Eighth Amendment claim, and Counts I and III should be dismissed.

### A.    Method-of-execution claims.

The Eighth Amendment forbids "cruel and unusual punishments," such as "burning at the stake, crucifixion. breaking on the wheel, or the like." *In re Kemmler*, 136 U.S. 436, 446 (1890). A claim that a method falls in that category must meet an "extremely demanding standard," *Smith*, 144 S. Ct. at 416 (Kagan, J., dissenting), an "exceedingly high bar" that no method-of-execution claim has ever surpassed in the Supreme Court, *Barr v. Lee*, 591 U.S. 979, 980 (2020); *accord Glossip*, 576 U.S. at 869. The inquiry "ask[s] whether the punishment 'superadds' pain well beyond what's needed to effectuate a death sentence." *Bucklew v. Precythe*, 587 U.S. 119, 137 (2019). "States have often sought more nearly the opposite,' developing new methods, such as lethal injection, thought to be less painful and more humane than

traditional methods, like hanging, that have been uniformly regarded as constitutional for centuries." *Lee*, 591 U.S. at 980 (citation omitted); *accord Barber v. Governor of Ala.*, 73 F.4th 1306, 1318 (11th Cir. 2023).

*First*, Boyd must plead that nitrogen hypoxia poses a "substantial risk" of "severe pain over and above death itself." *Nance*, 597 U.S. at 164. That severe pain must be "sure or very likely" to occur. *Glossip*, 576 U.S. at 877; *accord Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317, 1325-26 (11th Cir. 2019). The Constitution "does not guarantee a prisoner a painless death" or even a quick one. *Bucklew*, 587 U.S. at 132.

*Second*, Boyd must plead "an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Glossip*, 576 U.S. at 877. A "comparative exercise" is required to "decide whether the State has cruelly 'superadded' pain to the punishment of death." *Nance*, 597 U.S. at 164. Boyd's alternative must provide "the State a pathway forward," such as "a veritable blueprint for carrying the death sentence out." *Id.* at 169. Boyd also must show "that the State has refused to adopt [an alternative] without a legitimate penological reason"—i.e., the State has cruelly "chosen" to "superadd[] pain to the death sentence." *Bucklew*, 587 U.S. at 134. Among reasons not to adopt an alternative protocol are inability to secure necessary drugs, the necessary involvement of individuals unable to participate in an execution due to professional ethical restrictions, and the

state's interest in selecting a method of execution that "preserv[es] the dignity of the procedure." *Id.* at 134-35 (collecting cases).

***Third***, even if Boyd's complaint satisfies the test just discussed, he still must plausibly allege that the method was "calculated to superadd terror, pain, or disgrace." *City of Grants Pass v. Johnson*, 603 U.S. 520, 542 (2024) (citation modified).[6] To show the method "cruelly superadds pain," *Bucklew*, 587 U.S. at 133, Boyd must plead plausible facts that would prevent "prison officials from pleading that they were 'subjectively blameless,'" *Glossip*, 576 U.S. at 877.

As this Court noted earlier this year in a similar challenge, Boyd's "claim 'faces an exceedingly high bar.'" Memorandum Opinion at 18-19, *Frazier*, DE46 (quoting *Barr*, 591 U.S. at 980). The Court continued:

> Frazier's claim cannot succeed unless he establishes that the Protocol "presents a risk that is *sure or very likely* to cause serious illness and needless suffering" and also "gives rise to sufficiently *imminent* dangers." *Grayson*, 121 F.4th at 897 (emphases in original) (quoting *Price*, 920 F.3d at 1325). The Protocol must pose a "'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip*, 576 U.S. at 877 (quoting *Baze* [*v. Rees*, 553 U.S. 35, 50 (2008)]). To date, the United States Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual." *Bucklew*, 587 U.S. at 133.

*Id.* at 19.

---

6. *Grants Pass* was not a method-of-execution case, but it is offered to illustrate the Supreme Court's consistent articulation of the constitutional standard.

### B. Boyd does not plausibly allege a substantial risk of severe pain in Count I.

As in Frazier's and Grayson's complaints before his, Boyd alleges in Count I that the hypoxia protocol "will cause [him] to be deprived of oxygen while he remains conscious until he dies, and to experience inescapable superadded pain and terror as a result of his conscious suffocation." DE1:¶45. Citing *Baze*, he claims that "conscious suffocation during an execution violates the Eighth Amendment." *Id.* ¶137. He further alleges that if the nitrogen flow were to be interrupted during his execution, he could be rendered brain-damaged instead of dead. *Id.* ¶¶135-36.

### i.  The risk of "conscious suffocation."

Boyd's complaint centers around his concern of being "deprived of oxygen while he remains conscious until he dies." *Id.* ¶45. This, he alleges, will result in "inescapable superadded pain and terror," *id.*, and a "constitutionally unacceptable risk of suffocation," *id.* ¶46 (quoting dicta from the plurality opinion in *Baze*). But the method of execution at issue in *Baze* was completely different. There, the Supreme Court was discussing (and not evaluating, because they were uncontested) the risks of pancuronium bromide, which "inhibits all muscular-skeletal movements and, by paralyzing the diaphragm, stops respiration." 553 U.S. at 44. That does not happen with nitrogen hypoxia (and Boyd has not pleaded that it does). He never explains what about ADOC's protocol will cause his terror or pain or how it could be anything like having one's diaphragm paralyzed. There are more or less painful

ways (and even *painless* ways) that one can be deprived of oxygen while conscious, so merely observing that a method of execution involves deprivation of oxygen is not enough to state an Eighth Amendment claim. *See, e.g.*, *In re Ohio Execution Protocol Litig.*, 946 F.3d 287, 290 (6th Cir. 2019).

Boyd mainly relies on witness accounts of movement during the previous hypoxia executions to support his allegations that the deprivation of oxygen in those executions was painful. *See* DE1:¶¶48-67 (Smith), 68-77 (Miller), 78-86 (Grayson), 87-94 (Frazier), 95-100 (Hoffman), 101-08 (Hunt).[7] But he never confronts more likely causes of movement, including voluntary resistance (in the case of Smith) or involuntary movements associated with dying, which can be "misperceived as signs of consciousness or distress." *Baze*, 553 U.S. at 57; *accord* Memorandum Opinion at 8, 12-13, 38, 47, *Grayson*, DE95 (discussing evidence of Smith's resistance, his consumption of an illegal drug before his execution, his holding his breath, agonal breathing after unconsciousness, that even "brain-dead patients experience movement," etc.). On motion to dismiss, the Court need not credit any of these explanations. But neither must the Court accept allegations that are not "plausible" "given more likely explanations." *Iqbal*, 556 U.S. at 681. Boyd has offered a version of

---

7. Boyd directs the Court's attention to Smith's autopsy, *see* DE1:¶65, and claims that others have not been released, *id.* ¶¶76, 85, 93, 99, 107. Undersigned counsel do not have copies of Grayson's or Frazier's autopsies. Hunt was not autopsied for religious reasons by agreement with ADOC. Undersigned counsel have no knowledge of Louisiana's autopsy practices for executed inmates.

events that is no more than "merely consistent," *id.* at 678, with what some (mistaken) journalists said.

All of this was litigated in *Grayson v. Hamm*, a case that should not have survived motion to dismiss, either. Boyd restates Grayson's (and Frazier's) observation that the Smith autopsy noted "pulmonary edema," which is a swelling of the lungs. DE1:¶¶65-67. But Boyd's inference that there was "negative pressure" on Smith's airway (from what?) or an "upper airway obstruction" (from what?) are wholly conclusory and speculative. *Id.* The allegation appears to be that an inmate "experiencing panic" (why?) and "sensing an inability to breathe" (how?) will have his airway close up *entirely* and remain "conscious for several minutes *after* [being] deprived of all oxygen." *Id.* ¶59 (emphasis added). Boyd offers no allegation that panic-induced airway closure causing painful and prolonged suffocation has ever happened to anyone, and it is not plausible that it could happen to him. At a certain point, such confusing, elliptical, and hypothetical allegations—even if Boyd could find some expert to repeat them—should not proceed.[8]

---

8. Boyd, like Grayson and Frazier before him, claims that Smith's autopsy results specifically establish he suffered from **negative pressure** pulmonary edema ("NPPE"). *Id.* ¶65. As Judge Huffaker found in *Grayson*, Dr. McAlary, asserting signs of NPPE in Smith's autopsy, "finds himself without any real foundational support other than an unsupported opinion—no supporting articles or case studies, reliance upon highly questionable hearsay witness accounts, no support in Smith's autopsy report for an upper airway obstruction that led to negative pressure pulmonary edema, untested reliance on proposed alternatives with their own set of

To the extent that the alleged harm of "conscious suffocation," the core of Count 1, stems from an inmate's "panic," *id.* ¶43, Boyd has not pleaded an alternative that would significantly reduce the risk. There is not even an allegation that the mental distress of an inmate facing death would be reduced if ADOC gave Boyd a multi-drug cocktail, *see id.* ¶¶120-25, placed him in front of a firing squad, *see id.* ¶¶115-17, or put a noose around his neck, *see id.* ¶¶118-19.

### ii. The risk that the flow of nitrogen will stop while Boyd is alive.

Boyd offers the hypothetical that "[i]f the flow of nitrogen were to stop while the prisoner is still alive, this could lead to brain damage from oxygen deprivation insufficient to kill the death sentenced prisoner." *Id.* ¶135. But he offers no plausible facts to show that ADOC will stop the flow of nitrogen while he is alive (which, of course, would be contrary to the public interest in carrying out Boyd's sentence). Boyd does not contend that nitrogen stopped flowing while Smith, Miller, Grayson, Frazier, or Hunt (or Hoffman in Louisiana) were alive, much less add facts that would allow the Court to infer such possibility. To the contrary, Boyd alleges that the protocol uses "a mask to deliver 99.999% pure nitrogen gas," *id.* ¶30, and that it did cause death in the previous five Alabama hypoxia executions, *see id.* ¶¶49, 68,

---

risks and complications, unfounded theories of risks of mask leaks or monitoring device failures, and unfounded theories that the execution team cannot adequately monitor pulse oximeter or EKG devices or make the simple interpretations intended from them." Memorandum Opinion at 51, *Grayson*, DE95.

78, 87, 101. In these circumstances, there is no real risk pleaded that Boyd could survive and suffer some pain short of death.

Thus, Boyd has failed to plead that the "conditions presenting the risk" are "sure or very likely" to cause needless suffering and pose "sufficiently imminent dangers." *Baze*, 553 U.S. at 49-50.

### C.    Boyd does not plausibly allege a substantial risk of severe pain in Count III.

In Count III, Boyd alleges that the hypoxia protocol is unconstitutional as to him because he suffers from asthma and vertigo. DE1:¶¶156-60. Specifically, he claims that hypoxia "will very likely cause him to experience extreme psychological distress and panic" because he is asthmatic, that this panic will cause him to "experience a constricted airway like an upper airway obstruction," and that he may also "vomit, convulse, experience an inability to breathe, and/or otherwise suffer severe psychological pain." *Id.* ¶156. He states, "A medical examination prior to execution would allow for recognition of" issues related to his asthma "and permit the development of specific modifications to the process." *Id.* ¶159. As for his vertigo, Boyd claims that hypoxia "may cause him to experience extreme psychological distress and panic." *Id.* ¶158.

Boyd's claim is built entirely on speculation. He fails to explain why nitrogen hypoxia should be more distressing for him than any other method of execution. As the Court noted in *Frazier*:

> [T]he Eighth Amendment "does not demand the avoidance of all risk
> of pain in carrying out executions." [*Bucklew*, 587 U.S.] at 134 (quoting
> *Baze*, 553 U.S. at 47). Thus, Frazier is not guaranteed a painless death,
> in body or mind. *See id.* at 133. Consequently, the Protocol cannot be
> considered cruel and unusual simply because Frazier may experience
> psychological pain "either by accident or as an *inescapable* conse-
> quence of death." *See Baze*, 553 U.S. at 50 (emphasis added).

Memorandum Opinion at 22, *Frazier*, DE46. Indeed, in that case, Dr. McAlary—

one of Boyd's present experts—agreed that "[s]ome level of psychological pain is

inherent in the [execution] process." *Id.*; *see id.* at 29 ("But every method of execu-

tion involves a period during which the inmate experiences psychological pain be-

cause he realizes death is imminent."). And as Judge Huffaker wrote in *Grayson*:

> Other courts have held that psychological pain or mental suffering can-
> not by itself support an Eighth Amendment claim. *In re Ohio Execution
> Protocol Litigation*, 881 F.3d 447, 450 (6th Cir. 2018) (agreeing with
> the district court's assessment that "[p]sychological pain or mental suf-
> fering is a likely result of being sentenced to death and anticipating the
> execution, but that experience of psychological suffering could not by
> itself make a method of execution unconstitutional").

Memorandum Opinion at 46, *Grayson*, DE95.

Boyd fails to explain how the hypoxia protocol is sure or very likely to trigger

an asthma attack, much less vomiting or convulsions due to asthma. And even if he

had, he has not pleaded facts to support that he would remain conscious for any

significant period of time. As for vertigo, Boyd failed to plead how vertigo would

cause him to experience panic or "extreme psychological distress," DE1:¶159,

during a hypoxia execution. Boyd will be restrained on a gurney for the duration of his execution. DE11-3:16. He cannot plausibly allege a risk of falling from dizziness.

Thus, Boyd has failed to plead that the "conditions presenting the risk" are "sure or very likely" to cause needless suffering and pose "sufficiently imminent dangers." *Baze*, 553 U.S. at 49-50.

### D.   Defects of Boyd's alternative methods of execution cause Counts I and III to fail as a matter of law.

Boyd must plead and "prove a known and available alternative," *Glossip*, 576 U.S. at 880, that the State has "refuse[d] to adopt" despite "documented advantages," *Baze*, 553 U.S. at 52. The alternative must allow the State to carry out the sentence "relatively easily and reasonably quickly." *Bucklew,* 587 U.S. at 141. This standard is extraordinarily high. *See Barber*, 73 F.4th at 1318. A plaintiff cannot *force* States to "experiment" with new methods, *Bucklew*, 587 U.S. at 142, or adopt a method to reduce risk "slightly," *Baze*, 553 U.S. at 51. Rather, the Eighth Amendment comes into play only when the state rejects an alternative with "comparative efficacy" so "well established" that "failure to adopt it" makes officials subjectively blameworthy. *Id.* at 57; *accord Bucklew*, 587 U.S. at 142. The standard is not an invitation to toss out a hypothetical method with gaps so large that it is unclear whether or how the state would implement it, leaving room for yet another challenge. *See Bucklew*, 587 U.S. at 141-42; *Nance,* 597 U.S. at 169; *see also Hamm v. Smith*, 143 S. Ct. 1188, 1189 (2023) (Thomas, J., dissenting from denial of certiorari).

### i.    Firing squad.

Boyd's first alternative is the firing squad. DE1:¶¶115-17, 138. In Alabama, this would require the development of a protocol, the construction of any necessary infrastructure, and training of execution personnel. But instead of providing the Court "a veritable blueprint for carrying the death sentence out," *Nance*, 597 U.S. at 169, Boyd refers to Utah's firing squad protocol and suggests that Oklahoma "use[s] or could use the firing squad," DE1:¶¶ 115-16.

Boyd's complaint does not seriously claim that execution by firing squad would significantly reduce any risk of severe pain from nitrogen (if such risk even existed). He alleges that firing squad executions, "while described as 'barbaric,'" offer "a record of relative speed and certainty for the condemned[.]" *Id.* ¶117. But nothing in his complaint explains how placing Boyd in front of a line of officers with guns would reduce his alleged panic or psychological distress, much less prevent complications from his vertigo and alleged asthma. *See id.* ¶158. And that is assuming everything goes as planned, but Boyd acknowledges in his complaint that "maladministration" of a method might increase pain. *Id.* ¶114 n.36. From his complaint, there is no reason to infer that everything in a firing execution will work properly or that remaining conscious with one or more gunshot wounds is significantly less painful than death by nitrogen hypoxia.

### ii.    Hanging.

Boyd's second proposed method of execution is hanging. DE1:¶¶118-19. While Alabama, like most states, employed hanging as a method of execution early in its history, hanging has not been a method of execution in Alabama since March 1927. ALA. CODE § 5309 (1923).[9] In the modern era, only three American inmates have been hanged, two in Washington and the last in Delaware in 1996.[10] While Boyd claims that "Delaware, New Hampshire, and Washington…use or could use hanging as a method of execution, making it a known alternative," DE1:¶118, this is false—all three states have removed capital punishment from their statutes. Boyd suggests that ADOC could use "an existing protocol from one of these states," *id.*, but he offers no such protocol to the Court or to Defendants. Indeed, the last standing gallows in the United States was demolished in Delaware in July 2003.[11]

Again, Boyd's complaint does not seriously claim that execution by hanging would significantly reduce any risk of severe pain from nitrogen (if such risk even

---

9. Hanging was the sole method of execution during the days of the Mississippi Territory, as is reflected in the 1802 and 1807 territorial codes. A century later, hanging was still the method of execution in Alabama. ALA. CODE § 7639 (1907). The 1923 Code introduced electrocution as the method of execution, to take effect in 1927.
10. *Execution Database*, DPIC, https://deathpenaltyinfo.org/facts-and-research/data/executions?method=Hanging (last visited July 23, 2025).
11. *E.g.*, *Delaware Gallows the Victim at Final Public Spectacle*, LJWORLD (July 9, 2003, 12:00 AM), https://www2.ljworld.com/news/2003/jul/09/delaware_gallows_the.

existed). He pleads no facts suggesting how hanging is significantly safer than nitrogen hypoxia, nor does he suggest how having a noose placed around his neck and being forced onto a trapdoor would reduce his alleged panic, psychological distress, or symptoms from vertigo and asthma. *See id.* ¶158.

### iii.    MAID.

Boyd's third proposed method of execution is MAID—Medical-Aid-in-Dying, aka "Death with Dignity." *Id.* ¶120. While MAID is authorized for euthanasia in eleven states and Washington, D.C.,[12] it is not an approved method of execution in any state. The drug cocktail Boyd suggests to the Court, DDMAPh, is comprised of digoxin, diazepam, morphine, amitriptyline, and phenobarbital. *Id.* ¶122. Boyd claims that the "the median time to complete loss of consciousness is 5.8 minutes, but the patient loses some awareness much sooner." *Id.* ¶123. MAID is not feasible or readily available to ADOC as a matter of law, nor does Boyd offer the Court anything resembling "a veritable blueprint" for its use. *Nance*, 597 U.S. at 169.

***First***, while Boyd's complaint lists the drugs in the DDMAPh cocktail, it does not specify how said cocktail is introduced to the inmate—intravenous infusion, intramuscular injection, oral ingestion, or some other route? Nor does it answer who will administer it. Will it require a doctor, for instance? If so, Boyd has not, nor can

---

12. *States Where Medical Aid in Dying is Authorized*, COMPASSION & CHOICES, https://compassionandchoices.org/states-where-medical-aid-in-dying-is-authorized (last visited July 23, 2025).

he, identify a doctor willing to push the lethal drugs in case he opted not to, especially if he chose a route requiring the setting of a feeding tube or similar equipment.

**Second**, Boyd has not pleaded facts showing that any of the drugs in the DDMAPh cocktail are available to ADOC *for use in an execution*. Even if ADOC's contract provider can procure some or all of the drugs to use for inmate medical purposes, that does not make them available for use as a method of execution.[13] It is no secret that pharmaceutical manufacturers have put pressure on state departments of corrections to not use their products in executions; sodium thiopental was pulled from the U.S. market entirely as a result of pressure from death penalty abolitionists and the Italian government. *Glossip*, 576 U.S. at 869-72 (discussing lethal injection progression from sodium thiopental to pentobarbital, then to midazolam). As a matter of law, Alabama has a legitimate penological reason not to adopt such methods that "depend so heavily on external variables," Memorandum Opinion at 31, *Frazier*, DE46, because "the question of capital punishment belongs to the people and their representatives," *Bucklew*, 587 U.S. at 150, not activists and drug companies, *cf. Price*, 920 F.3d at 1327 (noting that no "supply concerns exist for nitrogen," which "is easily purchased").

---

13. Deborah Crook, ADOC's Deputy Commissioner of Health Services, testified in *Grayson* that YesCare is ADOC's contract healthcare provider, and that it is "prohibited from participating in an execution, including providing midazolam, ketamine, and fentanyl." Memorandum Opinion at 8, *Grayson*, DE95.

As none of Boyd's alternatives are feasible, readily available, and significantly safer than nitrogen hypoxia, Counts I and III are due to be dismissed.

## IV. Count II should be dismissed because Boyd fails to state a claim.

In Count II, Boyd claims that Defendants "have interfered with" his Fourteenth Amendment due process rights because he has liberty and property interests concerning "any modification or amendment to Alabama's highly redacted Protocol," and Defendants have provided him only with "a highly redacted copy of their Protocol." DE1:¶¶145-46, 152. He contends that by doing so, "Defendants have withheld key facts from Mr. Boyd and his counsel that are necessary to support his claims." *Id.* ¶146.

To succeed on a procedural due process claim, Boyd must show "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1293 (11th Cir. 2020). He fails out of the gate, for as this Court has noted, "[T]he Eleventh Circuit has held that death row inmates do not have a due process right to disclosure of a state's execution protocol because there is no cognizable liberty interest in such information." *Woods v. Dunn*, 2:20-cv-58, 2020 WL 1015763, at \*12 (M.D. Ala. Mar. 2, 2020) (citing *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1293 (11th Cir. 2016); *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267 (11th Cir. 2014)); *see also Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th

Cir. 2015) (agreeing with Fifth and Eleventh Circuits that there is no "freestanding right to detailed disclosure" of state's execution protocol); *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014) ("[U]ncertainty as to the method of execution is not a cognizable liberty interest."); *Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013) ("There is no violation of the Due Process Clause from the uncertainty that Louisiana has imposed on Sepulvado by withholding the details of its execution protocol.").

Moreover, Boyd, like all death-row inmates, was provided a redacted copy of the execution protocol in late August 2023. *See* DE11-3. The protocol is redacted for security purposes, but it explains how a nitrogen hypoxia execution will proceed:

- After a final visual inspection of the system by the Warden or Assistant Warden, breathing air will be allowed to flow to the mask.

- The condemned will be taken to the execution chamber and restrained on the gurney. A pulse oximeter will be placed on him.

- Before the mask is placed on the condemned's face, a member of the Execution Team will use an oxygen meter to ensure that breathing air (instead of pure nitrogen) is flowing into the mask. The mask will then be placed on the condemned's face, the pulse oximeter will be monitored, and the Team Captain will verify that the mask is properly seated.

- The spiritual advisor will be brought in to minister to the condemned.

- After a check to ensure there are no legal impediments to execution, the Warden will cause the curtains to the witness rooms to be opened. He will enter the chamber and read the warrant. The condemned may then make his final statement.

- The Warden will check again with the Commissioner for any stays of execution before proceeding.

- Team members will make a final inspection of the mask to ensure proper placement.

- The Warden will then activate the nitrogen hypoxia system, causing nitrogen gas (instead of breathing air) to flow into the mask. The nitrogen will be allowed to flow for fifteen minutes or five minutes after flatline on an EKG, whichever is longer.

*Id.* at 16-18. While many of the redactions as to nitrogen hypoxia concern the specifics of the equipment and how it is tested and used (e.g., the location of a sensor, *id.* at 32), the protocol reveals that there are lockout valves, pressure gauges, and a wall-mounted oxygen monitor, *id.* at 32, 35, gas cylinders with valves and pigtail connections, *id.* at 32, manifolds for breathing air and nitrogen banks, *id.* at 33-34, a warning placard, *id.* at 34, a hose, attachment straps, and tubing (in the mask assembly), *id.* at 35, and portable oxygen meters, *id.* Boyd has pleaded no facts explaining what else he would need to know in order to challenge the protocol.

Boyd has no right to know every detail of Alabama's hypoxia protocol where redactions are made for facility security purposes. This claim is due to be dismissed.

## V. Count IV should be dismissed because Boyd fails to state a claim.

Count IV seeks an injunction from the Court enjoining Defendants from setting his execution or executing him via nitrogen hypoxia, based upon the allegations made in Counts I through III. As Boyd is due no relief on those claims, so too he is due no relief here.

## OBJECTION TO MOTION FOR PRELIMINARY INJUNCTION

Claims of this nature do not warrant the extraordinary relief of a preliminary injunction. *Barber*, 73 F.4th at 1323 ("purely speculative" claims did not warrant preliminary injunction). Even if Boyd's complaint satisfies the pleading standard for one or more claims, he is not likely to succeed, and the equities favor the State.

## I.    Boyd is not substantially likely to succeed on the merits.

### A.    Counts I and III

Boyd is unlikely to satisfy his burden of proving that it is substantially likely that ADOC will subject him to cruel and unusual punishment during his execution. As discussed above, *see supra* 2, much of the basis for his claim that the nitrogen hypoxia protocol is unconstitutional on its face and "creates a substantial risk of unconstitutional pain," DE1:¶133, is media accounts, *see id.* ¶¶48-108; DE11:5-10. Boyd's as-applied challenge is unsupported. Moreover, none of Boyd's stated alternatives are feasible, readily available, and significantly safer than nitrogen hypoxia.

### i.    Alabama's nitrogen hypoxia protocol provides a swift, painless execution.

Boyd does not mention in his motion, much less rebut, the substantial evidence that nitrogen hypoxia is a painless way to die.

The State's evidence includes federal guidance and accident reports detailing the dangers of breathing inert gas through a supplied-air respirator. *See, e.g.*, Ex. G. According to OSHA, workers who accidentally connect their respirators to inert

37

gases rather than breathing air can lose consciousness in twelve seconds and die within minutes, barring rescue. Boyd has not identified a case report or study of someone who knew he was entering a hypoxic state while breathing inert gas and managed to save himself. It happens that quickly, and it happens "without warning." Ex. G at 3; *accord* Ex. H ¶13.

The State's evidence also includes reports and studies of suicides using inert gases such as helium, argon, and nitrogen. *See, e.g.*, Exs. I, J, K, L. The method is so simple and reliable that activists like Dr. Philip Nitschke (Smith's expert in his § 1983 action) teach people how to commit suicide at home with materials they can buy on the internet. Dr. Nitschke had witnessed dozens of inert-gas suicides and never saw any indication of pain. The case reports of such suicides are published in medical journals, and they describe no attempts at self-rescue that would suggest severe pain. *See, e.g.*, Exs. I, J, K; *accord* Ex. H ¶13.

The State's evidence also includes five successful executions by nitrogen hypoxia. Smith, Miller, Grayson, Frazier, and Hunt became unconscious and died within minutes (as did Hoffman in Louisiana). Some witnesses described movement and abnormal breathing during those executions, which are explained by the men resisting—straining at the restraints, shaking their heads, or holding their breath—and then dying, which may come with involuntary movements, agonal breaths, and even convulsions. Boyd's expert Dr. McAlary has not disputed in prior litigation

38

that unconscious, hypoxic people can move. As the Supreme Court has recognized, an unconscious inmate's "convulsions or seizures [can] be misperceived as signs of consciousness or distress." *Baze*, 553 U.S. at 57.

Frazier's version of events rests on media reports by lay observers who did not know, for example, that Smith was holding his breath, and did not understand the concept of agonal breathing. *See, e.g.*, Memorandum Opinion at 12, 25 n.20, *Frazier*, DE46. Some of them reported outright falsehoods, like the suggestion that Alan Miller had an IV during the execution. These journalists have not been cross-examined, and they have not offered testimony under oath about their accounts. This Court previously deemed these accounts "unreliable evidence," *id.* at 25 n.19, while Judge Huffaker found them to be "highly questionable hearsay witness accounts," Memorandum Opinion at 51, *Grayson*, DE95.

Some observers—and Boyd—used colorful language like "writhed," which is unsupported and uncorroborated by anything known about inert-gas asphyxiation. Indeed, Boyd has not identified a single case report, study, or published account of anyone "writhing" in pain from breathing nitrogen. His idiosyncratic view cannot explain the evidence of accidental fatalities, which occur without warning, or inert-gas suicides, which are intended to be painless and peaceful.

Boyd has retained two experts in this matter, Dr. McAlary (who testified in *Grayson* and *Frazier*)[14] and Dr. Bickler (who was an expert in *Miller*). Once again, Dr. McAlary addresses what he saw during Grayson's execution. In *Frazier*, this Court credited "Dr. Antognini's expert opinions over the expert opinions Dr. McAlary offered in Grayson's litigation because Dr. McAlary's opinions were not sufficiently supported by research, scientific studies, or articles." Memorandum Opinion at 23, *Frazier*, DE46; *see id.* at 25. As for Dr. Bickler, he testified via deposition in *Hoffman* that nitrogen hypoxia does not cause physical pain, only "pain that's in the emotional response realm." Ex. M at 10:6-10. The experts vigorously disagree about the emotional symptoms, *compare* DE11-1 *with* Ex. H ¶¶38-42 (responding to Bickler), but at most, Boyd presents a "scientific controvers[y]," *Glossip*, 576 U.S. at 882, not the type of "well-established scientific consensus" needed to make this case "comparable to circumstances that the Court has previously held to be in violation of the Eighth Amendment" outside of method challenges. *Baze*, 553 U.S. at 67 (Alito, J., concurring).

Either way, as this Court has explained:

---

14. In *Grayson*, Dr. McAlary testified as an expert. In *Frazier*, he testified as a lay witness, describing his observations of Grayson's execution, which he witnessed as a "friend" of the inmate; he started to bolster his testimony with Grayson's counsel's notes and was instructed to put them away while he was on the stand. Hearing Transcript at 16:6-20, *Frazier*, DE45. Here, Dr. McAlary appears to have returned in his expert capacity, now drawing medical conclusions based upon his observations of Grayson's execution. DE11-4.

> A state's administration of capital punishment, which remains consti-
> tutional subject to the Eighth Amendment's protections, presumes the
> prospect of some pain. Indeed, "[p]sychological pain or mental suffer-
> ing is a likely result of being sentenced to death and anticipating the
> execution." *In re Ohio Execution Protocol Litig.*, 881 F.3d 447, 450
> (6th Cir. 2018) (citation omitted); (*see also* doc. 22-7 at 4, para. 7)
> (Dr. McAlary agreeing that "[s]ome level of psychological pain is in-
> herent in the [execution] process"). This psychological pain likely
> grows as execution day draws near—an unfortunate but "inescapable
> consequence of death." *Baze*, 553 U.S. at 50. The relevant question for
> the Court is whether the Protocol very likely causes "*needless* suffer-
> ing," *Grayson*, 121 F.4th at 897 (emphasis added); "cruelly *superadds*
> pain to the death sentence," *Bucklew*, 587 U.S. at 134 (emphasis added);
> or creates a "'substantial risk of *serious* harm,' an 'objectively intoler-
> able risk of harm' that prevents prison officials from pleading that they
> were 'subjectively blameless for purposes of the Eighth Amendment,'"
> *Glossip*, 576 U.S. at 877 (emphasis added) (citing *Baze*, 553 U.S. at
> 50).

Memorandum Opinion at 22-23, *Frazier*, DE46; *accord* JOHN LAURENCE, A HIS-

TORY OF CAPITAL PUNISHMENT 68 (1960) ("The behaviour of those who suffer death

by law is much the same the world over. Some enter the execution chamber with a

calmness which is almost unbelievable, others in a state of collapse[.]").

For these reasons, Boyd's theory of an emotional-distress violation of the

Eighth Amendment has not been sustained by any court. He is unlikely to prove that

hypoxia, a method of death so painless as to be unnoticeable in industrial accidents,

a method chosen as a peaceful means of suicide, is severely painful—physically or

psychologically. He has no likelihood of success on the merits.

### ii.    "Conscious deprivation of oxygen" is not "severe pain."

Because Boyd has no evidence that Alabama's hypoxia protocol causes any pain, he argues that being deprived of oxygen while conscious was recognized as creating a "constitutionally unacceptable risk of suffocation" in *Baze*, 553 U.S. at 53. DE11:14. Boyd misreads that case, misunderstands Defendants' position, and advances the same argument that was raised and rejected in *Grayson* and *Frazier*.

Clarification is needed as to "suffocation." The hypoxia protocol replaces an inmate's breathing air with nitrogen gas, so it deprives the inmate of oxygen. But that is not the same thing as "suffocation" in the colloquial or lay sense of the word, which conjures notions of choking, drowning, or smothering. *Accord* Ex. H ¶¶9-20, 29. *Mechanical obstructions* that prevent the inhalation of air and the exhalation of carbon dioxide can cause hypercapnia (also called hypercarbia), which could be uncomfortable and potentially painful. By contrast, the respirator mask used by ADOC allows mechanically normal breathing and the exhalation of carbon dioxide. *Id.* ¶¶17-19. For this reason, both Dr. Antognini and Kenneth Smith's expert agreed that if Smith experienced any discomfort, it was due to his own actions—that is, holding his breath. *Id.* ¶30 (discussing Philip Nitschke, *The Facts About Nitrogen Hypoxia 101*, THE PEACEFULL PILL HANDBOOK (Jan. 27, 2024), www.peacefulpillhandbook.com/the-facts-about-nitrogen-hypoxia-101).

42

Thus, there can be no comparison between nitrogen hypoxia and, for example, smothering with a bag or holding someone underwater, which were two of the highly misleading analogies Grayson had pressed in the Eleventh Circuit. That court held unanimously that Grayson's evidence "did not show that nitrogen hypoxia creates a substantial risk of conscious suffocation." *Grayson*, 121 F.4th at 898. There is no indication that Boyd comes with better evidence.

With this clarification in mind, it is easy to see how Boyd misuses *Baze*. *See* DE11:14. *Baze*'s dictum about "suffocation" does not apply because the Supreme Court was talking about an entirely different physical phenomenon. An inmate who received the second round of Kentucky's three-drug cocktail without a sedative would be sensate while his diaphragm and lungs become paralyzed, and his inability to expel carbon dioxide would cause hypercapnia. On top of that, an inmate who received potassium chloride without sedation would feel "burning and intense pain." 553 U.S. at 114 (Ginsburg, J., dissenting). If hypoxia were tantamount to suffocation in that regard, then hypoxia training for mountain climbers and pilots would be un-bearable. Years after *Baze*, Justice Breyer noted, "[T]he majority does not dispute the evidence suggesting that nitrogen hypoxia would be 'quick and painless' and would take effect in 20 to 30 seconds." *Bucklew*, 587 U.S. at 164-65 (Breyer, J., dissenting). No one fathomed that it would be *per se* unconstitutional under *Baze*.

Moreover, anything the *Baze* plurality said about "suffocation" was obiter dictum because the parties agreed that if the sedative did not work, the inmate undergoing lethal injection would experience "severe pain" due to the paralytic drug and the potassium chloride. 553 U.S. at 49. The only question was the likelihood that the sedative would not work as intended. The plurality found no real risk, so there was no occasion to decide whether some un-sedated pain would be constitutional. The assumption that administering pancuronium bromide and potassium chloride without a sedative would be unconstitutional has no bearing on nitrogen hypoxia.

Further, Boyd's reading of *Baze* cannot be squared with *Bucklew* and *Glossip*, which make clear that an inmate challenging a method of execution must show a high likelihood of severe pain. The Supreme Court specifically rejected the idea of a "list" of methods being "categorically off-limits." *Bucklew*, 587 U.S. at 136; *id.* at 137 ("The dissent insists that some forms of execution are just categorically cruel."). It would be surprising if *Baze* stood for a *per se* rule, and even more so after *Bucklew*.

### iii.    Boyd has no likelihood of success on his as-applied challenge.

As discussed above, *see supra* 27-28, Boyd claims in Count III that the hypoxia protocol is unconstitutional as to him because he suffers from asthma and vertigo. *See* DE1:¶¶156-60. In his motion for preliminary injunction, he mentions only asthma. DE11:16-17.

While Boyd claims that he is asthmatic, DE11-5, and Dr. Bickler opined based on that statement, DE11-1:5, Boyd's medical record undercuts his claim. For example, on June 27, 2023, Boyd was given a peak expiratory flow rate (PERF) test, used to determine airflow limitations, a common test used with asthmatic patients. He scored 600 L/min on all three tries. Ex. N at 3. A normal score for an African American male of Boyd's age and height is only 495 L/min,[15] meaning that Boyd performed better than he should have—not what one would expect to see from an asthmatic, especially not one who smokes fifteen cigarettes per day. *Id.* at 2. Further, Boyd has been prescribed Antivert (meclizine) for vertigo, DE11-5, which should "be administered cautiously in patients with asthma[.]"[16] If Boyd actually has asthma, it is remarkably well controlled. Moreover, he currently takes Antivert for his vertigo, DE11-5, and that medication should "be administered cautiously in patients with asthma[.]"[17]

Boyd fails to explain how the hypoxia protocol is sure or very likely to trigger an asthma attack or any other symptoms his complaint suggests, such as vomiting or

---

15. Several PERF calculators are available online. *See, e.g.*, John L. Hankinson, *Estimated/Expected Peak Expiratory Flow (Peak Flow)*, MDCALC, https://www.mdcalc.com/calc/790/estimated-expected-peak-expiratory-flow-peak-flow (last visited July 25, 2025); *Peak Expiratory Flow Predction*, MEDSCAPE, https://reference.medscape.com/calculator/179/peak-expiratory-flow-prediction (last visited July 25, 2025).

16. *Antivert Disease Interactions*, DRUGS.COM, https://www.drugs.com/disease-interactions/meclizine,antivert.html (last visited July 25, 2025).

17. *Antivert Disease Interactions*, DRUGS.COM.

convulsions due to asthma. As Dr. Antognini testified in *Frazier*, "the period between the nitrogen's activation and loss of consciousness is likely less than a minute." Memorandum Opinion at 28, *Frazier*, DE46; *accord Hoffman*, 2025 WL 763945, at *8 (finding time to unconsciousness would be "less than one minute"). If Boyd experiences asthma symptoms during his execution, he will not experience it for long, and certainly not to an unconstitutional degree.

### iv. Boyd's pleaded alternative methods of execution do not satisfy his burden, and ADOC has valid penological reasons to reject his proposals.

As set forth above, *see supra* 29-34, Boyd has offered three alternatives to nitrogen hypoxia: the firing squad, hanging, and MAID. DE11:18-19. He has no likelihood of success in showing that any are feasible, readily available, and would significantly reduce a risk of severe pain.

***Firing squad:*** Boyd is unlikely to show the State's failure to adopt firing squad over nitrogen hypoxia was cruel. *See Hoffman*, 131 F.4th at 336.

Boyd failed to provide the Court with "a veritable blueprint for carrying the death sentence out," *Nance*, 597 U.S. at 169, instead referencing firing squad protocols in Utah and Oklahoma, neither of which he attached to his motion for preliminary injunction. *See* DE1:¶¶115-16. Oklahoma has never conducted a firing squad

execution.[18] Utah has conducted three since 1977, while South Carolina has conducted two in 2025.[19] These are not "well-established protocols" from "another State." *Bucklew*, 587 U.S. at 140.

Boyd cannot show a substantial likelihood of success in proving that that execution by firing squad would significantly reduce any risk of severe pain from nitrogen. If he would experience psychological distress from a hypoxia execution, surely he would experience it in front of a firing squad, knowing he will soon experience what he alleges others have described as a "barbaric" death. DE1 ¶117.

And with bullets "shattering…bone" and "damag[ing]…the spinal cord," the physical pain would be "severe[]." Ex. H ¶45. Boyd is unlikely to show that being shot is significantly more humane than Alabama's physically painless protocol. Dr. Bickler, after all, conducts hypoxia "studies" on "human subjects." DE11-1:4; *see* Ex. H ¶ 39. Moreover, a perfect execution via firing squad is not guaranteed. Lawyers for Mikal Mahdi, the last inmate to be executed via firing squad, told the South Carolina Supreme Court that the execution was "botched," citing the state's autopsy report and a forensic report commissioned from another pathologist. Mahdi

---

18. The Associated Press, *2 Men on Oklahoma's Death Row Ask for Execution by Firing Squad Over Lethal Injection*. At present, the firing squad is the quaternary statutory method of execution in Oklahoma, behind lethal injection, nitrogen hypoxia, and electrocution. OKLA. STAT. tit. 22, § 1014.
19. *Execution Database*, DPIC, https://deathpenaltyinfo.org/facts-and-research/data/executions?method=Firing+Squad (last visited July 23, 2025)

was executed by a three-person firing squad, but his autopsy revealed only two bullet tracks, and neither bullet hit his heart directly.[20] Neither bullet directly hitting the inmate's heart suggests that death was not instantaneous. While Dr. McAlary appears to assume (at DE11-4:¶¶33-34) everything will go according to plan, Boyd alleges that "maladministration" might change the calculus for any method. *Id.* ¶114 n.36. But how likely is it the inmate will not "immediately" lose consciousness? *Id.* ¶117? What's the margin for error for this method that relies on humans hitting the proper location? And how painful is it to be shot up to "four" times if the inmate remains conscious? *Id.* ¶116. With these possibilities, the "difference" in risk is not "clear and considerable." *Bucklew*, 587 U.S. at 143.

The Legislature considered and rejected the firing squad in 2017. The Legislature may reasonably have determined that nitrogen hypoxia presents "an arguably more humane method" than the firing squad—and the Supreme Court has expressly recognized a State's "legitimate interest in selecting a method it regards as 'preserving the dignity of the procedure.'" *Id.* at 134; *see, e.g.*, DE1¶117 (describing firing squad as "unpleasant" and acknowledging that to some it is "barbaric"). With firing squad, moreover, multiple people have to pull the trigger and shoot the inmate to

---

20. Exs. O, P; Chiara Eisner, *A Firing Squad Tried to Shoot a Prisoner in the Heart. They Missed, Autopsy Indicates*, NPR (May 8, 2025, 2:41 PM), https://www.npr.org/2025/05/08/nx-s1-5389846/firing-squad-south-carolina-death-penalty-execution.

death—and the State has a legitimate reason to avoid methods that demand such involvement.

*Hanging:* Boyd failed to provide the Court with "a veritable blueprint for carrying the death sentence out," *Nance*, 597 U.S. at 169, instead directing the Court to Delaware, New Hampshire, and Washington, DE1:¶118. All three states have abolished the death penalty, the last execution by hanging was in 1996,[21] and the last gallows was demolished in 2003.[22] Boyd does not offer the Court a protocol from any of these states or from any other jurisdiction that Alabama could readily and feasibly adopt.

This alternative is unserious. Hanging, to be sure, has been "uniformly regarded as constitutional for centuries," *Barr*, 591 U.S. at 980, but it was often "slow[]" and "painful," and can result in "suffocation" lasting "several minutes," *Bucklew*, 587 U.S. at 132. For someone allegedly so concerned with "conscious suffocation," hanging is a peculiar alternative. Unsurprisingly, Boyd has no evidence to back up this claim—nothing to show that hanging is less likely to result in pain, and nothing even comparing the pain between the two. On this record, perhaps any record, he has no substantial likelihood of success in proving that hanging significantly reduces any risk of severe pain from hypoxia, physical or psychological.

---

21. *Execution Database*, DPIC.
22. *E.g.*, *Delaware Gallows the Victim at Final Public Spectacle*, LJWORLD.

From a penological standpoint, ADOC has legitimate reasons for not reverting to a method of execution not presently used in any State and not used in Alabama in nearly a century. *See id.* at 134 ( "[A] State has a legitimate interest in selecting a method it regards as 'preserving the dignity of the procedure'" (quoting *Baze*, 553 U.S. at 57)); *see also* Ex. H ¶46. Moreover, no ADOC personnel are trained to properly carry out an execution by hanging, Boyd does not explain how they could be, and should the execution go awry and the condemned's neck not break, he could be left to slowly suffocate.

**MAID:** Here, Boyd suggests that Alabama could be the first state in the nation to adopt MAID as a method of execution, using the DDMAPh cocktail. DE1:¶120-23. But he does not specify how the cocktail is to be administered to him, and if the common route is indeed oral, *see*, *e.g.,* Motion to Dismiss at 26, *Hoffman v. Westcott*, 3:25-cv-169 (M.D. La. Mar. 25, 2025), DE55-1, then Alabama has legitimate peno-logical reasons not to employ a method of execution that relies on the condemned being willing to swallow the lethal agent. And while the Academy of Aid-in-Dying Medicine (though not Boyd) suggests there are other routes for self-administration, including "rectal, feeding tube, or ostomy administration,"[23] these routes would re-quire either Boyd's participation or perhaps the assistance of a doctor willing to

---

23. *Non-Oral Self-Administration: A Guide for Bedside Clinicians Managing the Procedure*, ACAD. OF AID-IN-DYING MED., https://www.aadm.org/courses/non-oral (last visited July 24, 2025).

participate in an execution, which is prohibited by their code of ethics. Boyd has no substantial likelihood of success in identifying a doctor willing to give him lethal drugs via "rectal, feeding tube, or ostomy administration,"[24] as such would create ethical problems for the doctor.

Moreover, Boyd lacks evidence showing that the drugs in the DDMAPh cocktail are available to ADOC for use in an execution. And given the history of drug shortages, Alabama has a legitimate penological reason as a matter of law not to adopt method that may put the continued use of capital punishment beyond democratic control due to "external variables." Memorandum Opinion at 31, *Frazier*, DE46.

Further, Boyd offers the Court only the alleged "median time to complete loss of consciousness" with DDMAPh, "5.8 minutes." DE1:¶123. He does not state how long the cocktail will take to cause death, which organizations familiar with MAID suggest could be anywhere from two to **twenty-four hours**.[25] Boyd also meets some of the Academy's "red flag" criteria—his age and general good health suggest that his execution could be on the longer side.[26] If Alabama did adopt this method,

---

24. *Id.*
25. *Planning and Preparing for the Aid-in-Dying Day*, ACAD. OF AID-IN-DYING MED., https://www.aadm.org/for-patients-and-families/the-aid-in-dying-day (last visited July 24, 2025); *Death with Dignity Preparations*, END OF LIFE WASH. (emphasis added).
26. *Factors for Prolonged Deaths (Red Flags)*, ACAD. OF AID-IN-DYING MED., https://www.aadm.org/courses/redflags (last visited July 24, 2025).

perhaps Dr. Bickler would return to testify that it, too, causes an unconstitutional "lingering death." DE11-1:77. But Alabama need not take the chance because it has a "legitimate interest in providing for a quick, certain death." *Baze*, 553 U.S. at 58.

As none of Boyd's alternatives satisfy his Eighth Amendment burden, he is not entitled to a preliminary injunction as to Counts I and III.

### B.    Count II

Boyd cannot satisfy his burden of proving that it is substantially likely that his due process rights have been violated because he has not been given an unredacted copy of the execution protocol. He claims that "Defendants seek to deprive [him] of his life without affording him due process" because he has a "residual life interest," DE11:19, and that Defendants "have withheld key facts" about the execution protocol "necessary to support [Boyd's] claims," *id.* at 20.

At the outset, Boyd's counsel were given a copy of the unredacted protocol in accordance with the parties' expedited discovery schedule, DE26, on August 6, 2025.

Moreover, as set forth above, *see supra* 34-35, Boyd's procedural due process claim fails because "the Eleventh Circuit has held that death row inmates do not have a due process right to disclosure of a state's execution protocol because there is no cognizable liberty interest in such information." *Woods*, 2020 WL 1015763, at *12 (citing *Jones*, 811 F.3d at 1293, and *Wellons*, 754 F.3d at 1267); *see also Zink*, 783

F.3d at 1109 (agreeing with Fifth and Eleventh Circuits that there is no "freestanding right to detailed disclosure" of state's execution protocol); *Trottie*, 766 F.3d at 452 ("[U]ncertainty as to the method of execution is not a cognizable liberty interest."); *Sepulvado*, 729 F.3d at 420 ("There is no violation of the Due Process Clause from the uncertainty that Louisiana has imposed on Sepulvado by withholding the details of its execution protocol.").

And while the execution protocol is redacted for security reasons, the redacted version provides ample information about how a hypoxia execution proceeds. *See* DE11-3; *see also supra* 35-36. Boyd has pleaded no facts explaining what else he would need to know in order to challenge the protocol.

As Boyd has no substantial likelihood of success as to his due process claim, he is not entitled to a preliminary injunction as to Count II.

### C.    Count IV

While Count IV, DE1:¶¶161-66, is not specifically addressed in the motion for preliminary injunction, Count IV requests preliminary and permanent injunctive relief concerning his Eighth Amendment and due process claims, and so is contemplated by the motion. As Boyd is not entitled to a preliminary injunction as to Counts I through III, he is not entitled to any relief as to Count IV.

## II.    The equities favor denial of the motion for preliminary injunction.

"[A] stay of execution is an equitable remedy" that "is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). To reiterate, "a court may grant a stay of execution *only* if the moving party establishes that: '(1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; *and* (4) if issued, the injunction would not be adverse to the public interest.'" *Brooks*, 810 F.3d at 818 (citations omitted).

As discussed in the preceding section, Boyd cannot satisfy the first prong. Further, the balance of the equities favors the State. Boyd's complaint is untimely, he has not shown a substantial threat of irreparable harm, and preventing his execution would be adverse to the public interest.

### A.    Boyd's complaint is untimely.

"A court considering a stay must…apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Hill*, 547 U.S. at 584 (citation omitted). As the Eleventh Circuit explained in *Woods*:

> Equity strongly disfavors inexcusable delay. "The Supreme Court has unanimously instructed the lower federal courts on multiple occasions

that we must apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such time as to allow consideration of the merits without requiring entry of a stay.'" *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1297 (11th Cir. 2016) (quoting *Hill*, 547 U.S. at 584); *see also Gomez v. U.S. Dist. Ct. for N. Dist. of Calif.*, 503 U.S. 653, 654 (1992). "Last-minute stays should be the extreme exception, not the norm, and the last-minute nature of an application that could have been brought earlier, or an applicant's attempt at manipulation, may be grounds for denial of a stay." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019) (internal quotation marks omitted). Woods's execution was scheduled on January 30, 2020, for March 5, yet he waited until February 24—10 days before the execution—to move the district court for a stay of execution. We agree with the district court's well-reasoned ruling that the last-minute nature of his motion for a stay is unjustified.

951 F.3d at 1293 (citations edited). Here, it is telling that Boyd never addresses timeliness in his motion for preliminary injunction (nor his complaint), as this litigation is untimely.

This Court, like the Supreme Court, has repeatedly cautioned against the all-too-common practice in execution litigation of waiting until the last minute to initiate proceedings, thereby throwing the Court into an emergency posture. For example, in *Mills v. Hamm* last year, the Court found that the inmate plaintiff was not entitled to equitable relief in part because of the untimeliness of his filings:

Mills filed this § 1983 action on April 26, 2024. He filed his motion for a preliminary injunction or stay of execution on May 3, 2024, but only after this Court prompted him to do so. Mills' postconviction litigation timeline and other relevant developments reflect that Mills' request for a preliminary injunction or stay was filed: (1) twenty-four months after the United States Supreme Court denied certiorari on his habeas petition; (2) about twenty-one months after Joe James' execution and contemporaneous media reports concerning alleged delays during the

55

execution; (3) eighteen months after Alan Miller's failed execution at-
tempt and Miller's amended complaint alleging a nearly two-hour re-
straint on the gurney; (4) about fifteen months after Kenneth Smith's
failed execution attempt and Smith's amended complaint alleging a
four-hour restraint on the gurney; (5) fifteen months after Governor
Ivey requested that the Alabama Supreme Court expand the timeframe
for ADOC to carry out executions; (6) fourteen months after the Ala-
bama Supreme Court amended Rule 8 permitting the Governor to set a
timeframe for ADOC to carry out executions; (7) nearly eleven months
after Governor Ivey set James Barber's execution for a thirty-hour
timeframe; (8) about nine months after Barber's execution; (9) about
three months after the State moved the Alabama Supreme Court to set
Mills' execution date; (10) more than six weeks after the Alabama Su-
preme Court granted the State's motion; (11) more than five weeks after
Governor Ivey set the timeframe for Mills' execution; and (12) fewer
than four weeks before the beginning of his May 30, 2024 execution
timeframe. Meanwhile, between March 4, 2024 and April 16, 2024,
Mills has litigated in the Alabama Supreme Court, Marion County Cir-
cuit Court, and the United States District Court for the Northern District
of Alabama.

The Court concludes that Mills' delay in filing suit and seeking
a preliminary injunction or stay of execution was "unreasonable, un-
necessary, and inexcusable." *See Brooks v. Warden*, 810 F.3d 812, 824
(11th Cir. 2016) (citation omitted). The Court finds that he knew or
should have known of the facts giving rise to his challenges to the
State's execution procedures "well before he filed suit." *See Jones*, 485
F.3d at 640 n.3. Since 2022, many events have occurred which should
have triggered action by Mills, and yet he did not act.

Memorandum Opinion at 25-26, *Mills v. Hamm*, 2:24-cv-253 (M.D. Ala. May 21,

2024), DE26 (citations and footnote omitted). More recently, in *Frazier*—another

hypoxia challenge—this Court wrote:

First, the equities are not in Frazier's favor because he unreasonably
delayed filing this § 1983 action and seeking injunctive relief. Frazier's
Eighth Amendment claim is that the ADOC's nitrogen hypoxia proto-
col—released in late August 2023—is unconstitutional. Frazier

mentions the Protocol and its alleged shortcomings numerous times in the complaint, including his prayer for relief wherein he asks the Court to "[i]ssue an order declaring the Protocol unconstitutional and enjoining Defendants Hamm and Raybon from executing Mr. Frazier using the Protocol." His motion for a preliminary injunction confirms his position that "the Protocol violates the Eighth Amendment because it creates a risk of superadded pain," as further shown through his reliance on Dr. McAlary's opinion that the Protocol creates certain risks, and his argument that he will be irreparably harmed "if his execution under the Protocol is not enjoined." Yet he waited over a year to file this lawsuit

and more than sixteen months to request a preliminary injunction.

Frazier also argues that the State's nitrogen hypoxia executions in 2024 prove that the Protocol does not work as the State has suggested, and that during those executions, the inmates experienced pain and distress as evidenced by their movements for several minutes. But Frazier did not file this lawsuit until nearly ten months after Smith's execution and nearly two months after Miller's execution—and he waited even longer to seek injunctive relief.

Frazier's postconviction litigation timeline reflects that he filed this action over one year after the Protocol was publicly released, and he filed his request for a preliminary injunction (1) over sixteen months after the Protocol was released; (2) almost a year after Smith's execution; (3) almost four months after Miller's execution; (4) about three months after the State moved the Alabama Supreme Court to set his execution date; (5) two months after he filed this lawsuit; (6) one month after the Alabama Supreme Court granted the State's motion to set his execution date; and (7) fewer than four weeks before the beginning of his February 6, 2025 execution timeframe. And Frazier filed his motion for preliminary injunction only after this Court prompted him to do so.

The Court concludes that Frazier's delay in filing suit and, to a greater extent, seeking a preliminary injunction was "unreasonable, unnecessary, and inexcusable." *See Brooks v. Warden*, 810 F.3d 812, 824 (11th Cir. 2016) (citation omitted).

Memorandum Opinion at 33-35, *Frazier*, DE46 (citations and footnotes omitted).

Boyd's complaint concerns the same execution protocol that Frazier—and Grayson, Miller, and Smith before him—challenged in the Middle District. That Boyd filed his motion for preliminary injunction the same week that he filed his complaint does not render this action timely.

Adopting the format of the Court's opinions above, Boyd filed his complaint:

(1)    nearly seven years and one month after he elected nitrogen hypoxia (June 27, 2018);[27]

(2)    almost twenty-three months after ADOC implemented the nitrogen hypoxia execution protocol (August 25, 2023);

(3)    almost eighteen months after Smith's execution (January 25, 2024);

(4)    almost ten months after Miller's execution (September 26, 2024);

(5)    almost eight months after Grayson's execution (November 21, 2024);

(6)    more than five months after Frazier's execution (February 6, 2025);

(7)    almost four months after Hoffman's execution in Louisiana (March 18, 2025);

(8)    more than a month after Hunt's execution (June 10, 2025); and

(9)    more than a month after the State moved again for Boyd's execution (June 11, 2025).

In other words, Boyd has known since June 2018 that he would be executed by nitrogen hypoxia, and he has known since August 2023 what protocol Alabama planned to use to carry out his execution. In March 2024, Boyd complained in his

---

27. Ex. Q.

quarterly newsletter column about Smith's "torturous, barbaric, heinous, cruel, atrocious, careless, and []reckless" execution.[28] And as Boyd is presently represented by the same firm that has represented him since his habeas proceedings commenced in 2005, he could have filed a second § 1983 method-of-execution action long before July 2025, or at least in time to give this Court an opportunity to resolve his claims without needing to weigh the propriety of emergency injunctive relief.

The Supreme Court made clear in *Bucklew* that "[l]ast-minute stays should be the extreme exception, not the norm, and 'the last-minute nature of an application' that 'could have been brought' earlier, or 'an applicant's attempt at manipulation,' 'may be grounds for denial of a stay.'" 587 U.S. at 150 (quoting *Hill*, 547 U.S. at 584). Should a court permit execution litigation to proceed, then it "'can and should' protect settled state judgments from 'undue interference' by invoking [its] 'equitable powers' to dismiss or curtail suits that are pursued in a 'dilatory' fashion or based on 'speculative' theories." *Id.* at 150-51 (quoting *Hill*, 547 U.S. at 584-85). More recently, in *Nance*, the Supreme Court stated:

> One last point from *Bucklew*—this one about "dilatory" tactics—bears repeating here. *Id.* at 1134. In recognizing that § 1983 is a good vehicle for a claim like Nance's, we do not for a moment countenance "last-minute" claims relied on to forestall an execution. *Ibid.* "Courts should police carefully against attempts to use [method-of-execution] challenges as tools to interpose unjustified delay." *Ibid.* In deciding whether to grant a stay of execution, courts must consider whether such a

---

28. Ex. F. The newsletter, covering January–March 2024, was uploaded to the website March 22, 2024.

> challenge "could have been brought earlier" or otherwise reflects a prisoner's "attempt at manipulation." *Ibid.* (internal quotation marks omitted).

597 U.S. at 174 (citation edited). Boyd could have brought this action in a timely fashion. His failure to do so is indicative of manipulation, as is his choice to plead three alternative methods of execution that are not used in Alabama, or hardly anywhere; if Boyd were interested in constitutionality, rather than mere delay, he could have pleaded lethal injection or execution—giving "the State a pathway forward," *id.* at 169—instead of this gambit at another multi-year suspension of his sentence. The equities should weigh strongly against preliminary injunctive relief.

### B.    Boyd has not shown a substantial threat of irreparable harm.

Boyd has not shown that he will suffer irreparable harm absent an injunction. The State does no cognizable harm, let alone irreparable harm, when it carries out a lawful and just sentence. To the contrary, punishing the guilty is the fulfillment of the public's "moral judgment." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). Boyd's execution, on its own, cannot be deemed an irreparable harm.

Boyd offers only speculation, not a substantial and imminent harm. The alleged violation of his constitutional rights is "not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000).

### C.    Preventing the State from carrying out Boyd's lawfully imposed sentence would be adverse to the public interest.

The Supreme Court has acknowledged that "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Bucklew*, 587 U.S. at 149 (quoting *Hill*, 547 U.S. at 584). Boyd has been on death row since 1995 for his part in the horrific murder of Gregory Huguley, who died over a mere $200 debt.

On July 31, 1993, Boyd was riding in a rented van with Shawn Ingram and Marcel Ackles, looking for Huguley, who owed them $200 for cocaine. A fourth man, Quintay Cox, joined them and provided a 9-millimeter pistol. The men searched the streets of Anniston until they found Huguley. Ingram, armed with the pistol, told him to come closer; when he hesitated, Ingram grabbed Huguley and pushed him into the van. The men stopped at a gas station, where Ackles pumped gasoline into a plastic container. They then proceeded to a baseball field in the Munford community, with Huguley forced to the van's floor by Boyd and Ingram, begging the others not to kill him and promising to get their money. Once they arrived at the field, Ingram made Huguley lie on a bench. Using duct tape, Ackles bound his hands and covered his mouth, while Boyd bound his feet. Huguley was then taped to the bench itself. Ingram doused Huguley with gasoline and made a two-foot trail of gas, which he lit. The men watched Huguley burn for ten to fifteen minutes, until the fire went out and Huguley was dead. *Boyd*, 715 So. 2d at 832.

As the Eleventh Circuit has explained:

> Stays of executions where the conviction and sentence are valid impose a cost on the State and the family and friends of the murder victim. As we have stated many times, "[e]ach delay, for its span, is a commutation of a death sentence to one of imprisonment." *Thompson v. Wainwright*, 714 F.2d 1495, 1506 (11th Cir. 1983); *see McNair v. Allen*, 515 F.3d 1168, 1176 (11th Cir. 2008) (same); *Jones v. Allen*, 485 F.3d 635, 641 (11th Cir. 2007) (same); *Williams v. Allen*, 496 F.3d 1210, 1214 (11th Cir. 2007) (same); *Schwab v. Sec'y, Dep't of Corr.*, 507 F.3d 1297, 1301 (11th Cir. 2007) (per curiam) (same); *Rutherford v. McDonough*, 466 F.3d 970, 978 (11th Cir. 2006) (same); *Lawrence v. Florida*, 421 F.3d 1221, 1224 n.1 (11th Cir. 2005) (same).

*Bowles v. Desantis*, 934 F.3d 1230, 1248 (11th Cir. 2019). It has now been more than thirty-two years since Boyd murdered Huguley. His conventional appeals were fully litigated as of June 2013, and he has been represented by competent counsel at every stage of the proceedings. Boyd's present claims are meritless, and further delay to the execution of his just sentence would not serve any public benefit.

## CONCLUSION

For the above reasons, Boyd's complaint is due to be dismissed. Further, Defendants oppose the injunctive relief Boyd requested, and for the above-mentioned reasons, preliminary injunctive relief should be denied.

In the event the Court determines that preliminary injunctive relief is warranted, any injunction should be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).

Respectfully submitted,

Steve Marshall
*Attorney General*

**<u>/s/ Polly S. Kenny</u>**
Polly S. Kenny
Assistant Attorney General

Lauren A. Simpson
*Deputy Attorney General*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification of such filing to the following: **Matthew C. Moschella, John C. La Liberte, David A. Michel, Noel Y. Cho-Carr,** and **Eyal Schwartz.**

_/s/ Polly S. Kenny_
Polly S. Kenny
_Assistant Attorney General_

ADDRESS OF COUNSEL:

Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Polly.Kenny@AlabamaAG.gov